## BURGESS *v.* SELIGMAN.

1. By a statute of Missouri, stockholders of a corporation at its dissolution are liable for its debts; but it is provided that no person holding stock as executor, administrator, guardian, or trustee, and no person holding stock as collateral security, shall be personally subject to such liability, but the persons pledging such stock shall be considered as holding the same, and liable; and the estates and funds in the hands of executors, &c., shall be liable. *Held*, 1. That persons to whom a corporation pledges its stock as collateral security are within the exemption of the statute. 2. That certificates of the stock absolute on their face, issued in trust or as collateral security to a creditor, may be shown to be so held by evidence *in pais*. 3. That the person holding such stock in trust, or as collateral security, is not, by his voting thereon, estopped from showing that it belongs to the company, and that he holds it as collateral security.
2. The Supreme Court of Missouri, after the Circuit Court had decided this case, made a contrary decision against the same stockholders, at the suit of another plaintiff, holding that the clause of exemption in the statute does not extend to persons receiving from the corporation itself stock as collateral security. *Held*, that this court is not bound to follow the decision.
3. The courts of the United States, in the administration of State laws in cases between citizens of different States, have an independent jurisdiction co-ordinate with that of the State courts, and are bound to exercise their own judgment as to the meaning and effect of those laws.
4. Where, however, by the course of the decisions of the State courts, certain rules are established which become rules of property and action in the State, and have all the effect of law, — especially with regard to the law of real estate and the construction of State constitutions and statutes, — the courts of the United States always regard such rules as authoritative declarations of what the law is.   But where the law has not been thus settled, it is their right and duty to exercise their own judgment; as they also always do in reference to the doctrines of commercial law and general jurisprudence: and when contracts and transactions have been entered into and rights have accrued thereon under a particular state of the decisions of the State tribunals, or when there has been no decision, the courts of the United States assert the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be given by the State courts after such rights have accrued.

5. But even in such cases, for the sake of harmony and to avoid confusion, the courts of the United States will lean towards an agreement of views with the State courts, if the question seems to them balanced with doubt.

6. Acting on these principles of comity, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the State courts.

7. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States was to institute independent tribunals which it might be supposed would be unaffected by local prejudices and sectional views, it is their duty to exercise an independent judgment in cases not foreclosed by previous adjudication.

8. A judgment entered by consent for a specific amount, subject to any credits which the defendant may produce vouchers for, is good as between the parties themselves and their privies.

ERROR to the Circuit Court of the United States for the Eastern District of Missouri.

The case is stated in the opinion of the court.

*Mr. John P. Ellis* and *Mr. Benjamin H. Bristow* for the plaintiff in error.

*Mr. Joseph H. Choate, Mr. James O. Broadhead,* and *Mr. H. H. Harding* for the defendants in error.

MR. JUSTICE BRADLEY delivered the opinion of the court.

This is an action brought by the plaintiff, Burgess, against J. & W. Seligman & Co., as stockholders of the Memphis, Carthage, and Northwestern Railroad Company, under a statute of the State of Missouri to recover a debt due to him by the company. The plaintiff, in his petition, alleges that on the 5th of November, 1874, judgment was rendered in his favor against the corporation by the District Court of Cherokee County, Kansas, for $73,661, which remains unsatisfied; that in December, 1874, the corporation was dissolved; and that the defendants, at the date of the dissolution and of the judgment, were, and still are, stockholders of the corporation to the amount of $6,000,000, on which there is due and unpaid $1,000,000; and he demands judgment for the amount of his debt. Joseph Seligman, the principal defendant, answered, denying that the defendants were ever stockholders, or subscribers to the stock, of the corporation, and setting forth cer-

tain facts and circumstances (stated in the findings) under which the stock alleged to be theirs was merely deposited in their hands by the corporation in trust for a temporary purpose by way of collateral security, to be returned when that purpose was accomplished.

The cause was tried by the court, and judgment was rendered for the defendants on certain findings of fact; and the question here is, whether the facts as found are sufficient to support the judgment.

The principal facts upon which the case must turn are substantially the following : —

The Memphis, Carthage, and Northwestern Railroad Company was a corporation organized under the general laws of Missouri, with an authorized capital of $10,000,000. On the 10th of March, 1872, a contract in writing was entered into between the corporation and J. & W. Seligman & Co. (the defendants), which is set forth in the findings. In the recitals of this contract it was stated that certain municipal subscriptions, in the shape of bonds, to the amount of $645,000, had been obtained in aid of its construction; and that a portion of the road (27 miles) was already graded, bridged, and tied, and the right of way obtained, and all paid for by the proceeds of said subscriptions, and that the company now sought additional capital for procuring iron and equipment for the road by the sale of its first-mortgage bonds: it was, therefore, agreed that the railroad company should furnish the capital necessary to completely prepare the road for the iron, and would execute and deposit with the defendants their entire issue of first-mortgage bonds, to wit, $5,000,000, and a majority of their capital stock authorized to be issued, " said stock to remain in the control of said party of the second part [J. & W. Seligman & Co.] for the term of one year at least." The latter agreed to purchase two thousand tons of railroad iron under the railroad company's direction, and from time to time to make advances of cash during the completion of the road, not exceeding $200,000 (including the amount paid for iron), and to receive interest thereon at the rate of seven per cent per annum until reimbursed by sale of the bonds. They were to have the privilege for the term of twelve months of calling any portion of the

$5,000,000 of bonds at the rate of seventy cents currency and accrued interest less two and a half per cent, and if more bonds were sold than enough to iron the road, they should advance funds to purchase rolling-stock $2,000 per mile, the balance to remain with them on deposit on interest at the rate of call loans to pay any deficiency in net earnings of the road to meet demands for interest on the bonds. If the bonds, or part of them, could not, for any unforeseen cause, be negotiated during the next twelve months, the company were to repay to J. & W. Seligman & Co. all moneys advanced by them with interest at the rate of seven per cent per annum and a commission of two and a half per cent on all bonds returned. This is the purport of the written agreement.

On the 1st of May, 1872, a trust deed was executed by the company on its railroad and appurtenances to Jesse Seligman and John H. Stewart, trustees, to secure the company's bonds. On the 11th of May, 1872, the following resolution of the directors was passed: " It is ordered by the board of directors that in making negotiations for money with J. & W. Seligman & Co., certificates for a majority of the capital stock of this company be issued to the said J. & W. Seligman & Co., *to hold in trust* for the period of twelve months, and that such certificates be signed by the president and secretary, with the corporate seal of this company affixed." A stock certificate for sixty thousand shares, or $6,000,000, was accordingly issued in the usual form to J. & W. Seligman & Co. This certificate was delivered to the defendants, but the court finds that they never subscribed for the stock, nor agreed to do so, and obtained it only in the manner set forth. The list of stockholders on the stock-book of the company, required by law to be kept, contains the names of certain townships which contributed aid to the road, and several individuals, including J. & W. Seligman, but not the amount of shares held. The stock transfer-book (also required by law) contained the same list, with date, number of shares, and amount carried out opposite to each name. The name of J. & W. Seligman appeared therein as follows : —

| NAMES. | RESIDENCE. | DATE. | No. OF SHARES. | AMOUNT IN DOLLARS. |
|---|---|---|---|---|
| * * * * J. & W. Seligman. | * * * * New York, N. Y. | * * * Dec. 20, 1872. | * * * * 60,000, sixty thousand (held in escrow). | *. * * * * 6,000,000, six millions. |
| * * * * | * * * * | * * * | * * * * * | * * * * * |

The court further found that shortly after the contract of March 14, 1872, Joseph Shippen, an attorney, of St. Louis, saw and examined its provisions, and a few days after told Burgess (the plaintiff) of the contract, and that thereby the Seligmans were to have control of the road and of the stock and bonds, and told Burgess it would be well for him to have a talk with Joseph Seligman before entering into contract with the railroad for its construction. Burgess accordingly saw Seligman, and testifies that the following conversation ensued : —

" I told him I had been constructing on that Carthage road, and that I understood he was interested in the road now, and I would like to talk to him on that matter; that this company owed me — or Cunningham, who was the president of the corporation — that he owed me then some money for work I had done between there and Pierce City, and I wanted to know what the prospect was for pushing the work forward, the means of getting the iron, and so on, and he said: ' I think the best thing you can do is to go on with the work westward, and we will have ample means to get hold of the local bonds.' It seems Cunningham had represented to him that there was local means enough to grade the road, and he suggested to me then that I would be safe in going on and entering into such a contract, and then he mentioned that he thought it would be better for all parties if the road was built and the work prosecuted westward."

Afterwards, on June 14, 1872, Burgess entered into a contract with the railroad company for the construction of the road from Carthage, Mo., to Independence, Kansas. He immediately began work under the contract, and so continued until the fall of 1873.

The bonds of the company to the amount of $864,000 were issued, and were negotiated and sold by J. & W. Seligman

& Co., they themselves becoming holders of over $400,000 thereof.

The stock issued to them was voted on by *proxy* at two successive annual meetings for election of directors.

The company being unable to meet its interest on the bonds, the road and property were delivered to the trustees of the mortgage and sold in December, 1874, and Joseph Seligman and Josiah Macy, as a bondholder's committee, became purchasers thereof, and the railroad corporation was dissolved in conformity with the laws of Missouri about the same time.

On the 5th of November, 1874, Burgess obtained judgment in the District Court of Cherokee County, Kansas, against the railroad corporation, for work and materials under his contract, for the sum of $73,661, which judgment recited that it was entered by agreement, with a stipulation that it would be entitled to a credit of the amount which had been paid by the railroad company to sub-contractors and laborers of the plaintiff, when the exact amount thereof should have been ascertained and proper vouchers furnished. No credits, however, were claimed. The present action was brought to recover the amount of this judgment.

The findings also set out the contract made by Burgess and his associate with the railroad company, 14th June, 1872, for constructing the road, by which it appeared that they agreed to take their pay in township bonds, so far as the same should be furnished.

Upon these facts the court gave judgment in favor of the defendants. Burgess brings the case here by writ of error.

The statutory provision upon which the action is founded is the twenty-second section of article 1 of the act of Missouri relating to private corporations, which declares as follows: " If any company, formed under this act, dissolve, leaving debts unpaid, suits may be brought against any person or persons who were stockholders at the time of such dissolution without joining the company in such suit, and if judgment be rendered and execution satisfied, the defendant or defendants may sue all who were stockholders at the time of dissolution for the recovery of the portion of such debt for which they were liable." 1 Wagner's Statutes, c. 37.

By sect. 9 of art. 2 of the same chapter, it is enacted as fol-
lows: " No person holding stock in any such company as
executor, administrator, guardian, or trustee, and no person
holding such stock as collateral security, shall be personally
subject to any liability as a stockholder of such company, but
the person pledging such stock shall be considered as holding the
same, and shall be liable as a stockholder accordingly, and
the estates and funds in the hands of such executor, adminis-
trator, guardian, or trustee shall be liable, in like manner and
to the same extent, as the testator or intestate, or the ward or
person interested in such fund, would have been if he had been
living and .competent to act, and held the stock in his own
name."

The first question for consideration is whether the plaintiff's
claim was established. He relied on the judgment recovered
by him against the corporation in Kansas. It is contended by
the defendants that this judgment does not establish any debt
due to the plaintiff. But we think that the objection is not
sound. The judgment, as against the corporation and its
privies, does establish the debt named therein as due to the
plaintiff, but subject to a defeasance for such an amount as
might be shown to have been paid to sub-contractors and
laborers by the corporation. The defendants, as well as the
corporation, were at liberty to show any credits which, by the
stipulation, were properly applicable in reduction of the amount
of the judgment. None such were shown, or attempted to be
shown. Until such credits were shown the judgment. stood
valid for the whole amount. It was not for the plaintiff, but
for the defendants, to show that any such credits existed.

The next and principal question is, whether J. & W. Selig-
man & Co., or J. & W. Seligman, were stockholders of the
Memphis, Carthage, and Northwestern Railroad Company,
within the meaning of the law.. Did the sixty thousand shares
of stock belong to them? or did they hold it by way of trust or
as collateral security for the fulfilment of the company's obli-
gations in relation to the bonds ? The courts in England, and
some in this country, have gone very far in sustaining a liabil-
ity for unpaid subscriptions to stock against persons holding
the same in any capacity whatever, whether as trustees, guar-

dians, or executors, or merely as collateral security. It cannot be denied that, in some cases, the extreme length to which the doctrine has been pushed has operated very harshly; and in cases in which the corporation itself has no just right to enforce payment, and where no bad faith or fraudulent intent has intervened, it may be doubted whether creditors have any better right, unless by force or some express provision of a statute. The Missouri statute recognizes the justice of making a discrimination between those who hold stock in their own right, and those who hold it merely in a representative capacity, or as trustees, or by way of collateral security.

Upon a careful examination of the facts found in this case we do not see how a reasonable doubt can exist, that the Seligmans held the stock in question as trustees and custodians by way of collateral security for themselves and the purchasers of the bonds. That was clearly the intent of the parties, declared in almost so many words; and that intent must prevail unless, by some inadvertency in carrying it out, the Seligmans have been unwittingly caught in some legal snare of which the creditors can take advantage. By the contract executed between them and the corporation they were to act as its financial agents in the disposal of its bonds, and to make advances of money from time to time to enable the company to get the necessary iron for completing its road and equipment for running it. The company were to prepare the superstructure and procure the ties and everything necessary by way of preparation for laying the iron down; and was to do this by means of the resources it had already secured, and expected to obtain, from the township subscriptions, in order that the mortgage to be given as security for the bonds might be good and valid for that purpose; and the company further agreed to *deposit* with Seligman & Co. a majority of its capital stock, to remain in their control for the term of one year at least. The reasonable inference is, that this deposit of stock was to be made for the purpose alleged in the defendant's answer, namely, as security for the payment of the bonds, and to enable Seligman & Co. to control the corporation and see that its affairs were honestly conducted and the earnings properly applied. The resolution of the directors, adopted for carrying out this agreement, is to

the same purport and effect: it directs that, in making negotiations for money with Seligman & Co., certificates for a majority of the capital stock should be issued to them to hold *in trust* for the period of twelve months; and when the stock was entered upon the transfer-book in the name of J. & W. Seligman, it was characterized as being " held in escrow."

The terms used may not have been strictly technical. The issuing of the stock in their names may not have been a " deposit " or an " escrow " in the strict sense of those words; but the intent is very clear, that the stock was not to be regarded as their stock, but as belonging to the company, though in their names, and that it was to be held by them simply as a security. They never subscribed for the stock, they never became indebted to the company for it, the company never acquired any right to demand from them a single dollar on account of it. Though issued in form, it was only issued in a qualified sense, to subserve a specific purpose by way of collateral security for a limited period, and was returnable to the company when that purpose should be accomplished. It seems to us that the Seligmans, in taking and holding the stock, held it merely in trust by way of collateral security for themselves and others, and that they were therefore within the express exception made by the law in favor of those holding stock in that way.

It is urged, however, that they are estopped from claiming the benefit of this exemption by their conduct in being represented and voting at stockholders' meetings. But if the law allows stock to be held in trust, or as collateral security, without personal liability; and if, as we suppose, the clear effect of the contract was to create such a holding in this case, — we do not see how the doctrine of estoppel can apply. The only parties to complain would be the other stockholders, who might, perhaps, complain that stock held merely in trust, or as collateral security, is not entitled to participate with them in the privilege of voting. But from them no complaint is heard. Creditors could not complain, for, on the hypothesis that stock may lawfully be held at all in trust, or as collateral security, without incurring liability to them, the act of voting on the stock cannot injure or affect them. In the absence of such a law the case might be very different. Undoubtedly it has

been held in cases innumerable, that acting as a stockholder binds one as such; but that is where the law does not allow stock to be held at all without incurring all the liabilities incident to such holding. The present is an action at law based upon the supposed liability of the defendants under a statute which makes the distinction referred to, and which does not make all stockholders liable indiscriminately. We think that this makes a material difference. If the defendants can show, as we think they have shown, that they are within the exception of the statute, the statutory liability does not apply to them.

It is by no means clear, however, that J. & W. Seligman did not have a right to vote on the stock, even as against the stockholders. When the law provides that if a person holds stock as a trustee, or by way of collateral security only, he shall not be personally liable for the company's debts, it supposes that the stock shall be holden, and that the pledgee or trustee shall be the holder. If, then, the law is to have any force or effect, the mere fact of holding cannot be set up as a bar or estoppel against proof of the manner and character of such holding. And if such pledgee or trustee may be a holder of the stock in that character, is he bound to be perfectly passive in his holding? He will not be entitled to any dividends or profits, it is true; or, if he receives dividends or profits, he must account therefor; but is it certain that he may not lawfully vote on the stock? An executor, administrator, guardian, or trustee certainly may vote; and where is the rule to be found that a holder for collateral security, under a law which permits such holding, may not vote on the stock so held without losing his character as a mere pledgee? But, as before said, if the pledgee in voting the stock exceeds his rights as such pledgee, it cannot have the effect of making the stock his own. No one is injured, and no one can complain except the other stockholders whose rights are invaded.

The line of authorities usually quoted to show that those who actually hold stock, and who manifest a voluntary or intentional holding by voting on it, or receiving dividends or other benefit from it, consists mainly of cases in which parties have been held as corporators or associates as between themselves

and the corporation or joint-stock association, and as such incidentally liable to the creditors of such companies. Sir Nathaniel Lindley, in his able treatise on Partnership, has amply discussed the whole subject upon the platform of the English decisions. His fundamental proposition is this : " The type, then, of a member or shareholder of a company is a person who has agreed to become a member, and with respect to whom all conditions precedent to the acquisition of the rights of a member have been duly observed. . . . In practice, difficulties are only presented where this standard is not reached ; and the important question really is to what extent it can be departed from, and membership be nevertheless constituted." Vol. i. p. 128. He then devotes many pages to show, by adjudged cases, how a man may be held as a corporator by the company itself; by holding himself out as such, as by taking dividends, &c. Now, in the present case the relation of J. & W. Seligman & Co. to the corporation is expressly settled and fixed by the written contract between them. We have already examined that contract, and have shown that the stock issued by the corporation to J. & W. Seligman & Co. was issued to them only as trustees and by way of collateral security. The proposition that the corporation could hold them as subscribers to its stock would be in flat defiance of the contract in whole and in every part. We do not know of any iron rule of law which would prevent them from showing this contract relation between them and the company. It is the origin and foundation of their whole connection with it. The sufficiency of the evidence to control their *status* towards the company is another thing. Its competency seems to us free from doubt. When examined it shows, as before stated, that as between them and the company the latter has no claim whatever against them in relation to the stock except to have it returned when properly required, after the purpose of its issue had been accomplished. It belongs to the company, and to it alone. J. & W. Seligman are mere trustees or custodians of it for a special purpose, that purpose being collateral security.

In this connection we may properly refer to the decision of the Court of Appeals of Maryland in the case of *Matthews v. Albert*, 24 Md. 527, which was a case arising upon the

Maryland statute from which that of Missouri was copied so far as relates to the exception of those holding stock in trust or as collateral security. That was a suit in equity brought against stockholders to render them liable for the company's debts. One of them, by the name of Tieman, had loaned money to the corporation, and, as security for its payment, a certificate of stock had been issued to him. After its issue an indorsement was made on it by the president of the corporation to the effect that it had been deposited with Tieman as collateral security for the loan. The court said : —

"The claim of W. H. Tieman is for $2,000, money alleged to be loaned to the company on the 8th of January, 1859. But it is insisted by the appellees, that Tieman, instead of being a non-stockholding creditor, is, according to the evidence, a stockholder, and as much liable as the Alberts. We do not concur in this view of the relation of Tieman to the company. In our opinion, his claim is for money loaned ; and the stock transferred to him was held by him as collateral security for his loan, and so holding it, he is not personally subject to any liability as stockholder, but is protected by the provision of the twelfth section of the act of 1852, c. 338."

A similar decision in a case arising upon a like statute in New York was made by the Commissioners of Appeal of that State in *McMahon* v. *Macy*, 51 N. Y. 155. The New York railroad act of 1850, as amended by the act of 1854, made stockholders liable to creditors of the company for the amount unpaid on their stock ; but the eleventh section of the act contained precisely the same provision as that in the ninth section of the Missouri law, that no person holding stock as executor, administrator, guardian, or trustee, and no person holding stock as collateral security, should be personally subject to any liability as stockholders, imposing the liability, however, as the Missouri law does, on the pledgor or *cestui que trust.* Macy was sued as a stockholder, and it was shown on the trial. that the stock held by him was transferred to him as collateral security. The referee refused to give any effect to this evidence, holding that parol evidence could not be received to contradict or vary the written assignments or transfers, which were absolute in form. The Commissioners of Appeal, on this

branch of the case, said: " In this he erred. It is always
competent to show that an assignment or conveyance absolute
in form was only intended as a security. There is nothing in
any statute which makes the books of the company incontro-
vertible evidence of ownership of stock. A person may be the
absolute legal and equitable owner of stock without any trans-
fer appearing upon the books." All the judges of the commis-
sion concurred in this opinion.

We do not well see how any different conclusion could
logically have been arrived at. If the law declares that stock
held as collateral security shall not make the holder liable,
surely it must be competent to show that it is so held. And
when this fact is once established, there is an end of the appli-
cation of estoppel, unless it can be invoked by some party who
has been specially misled by the conduct of the defendants.

It is urged by the plaintiff, in this case, that the defendants
are estopped as to him, because of a certain conversation be-
tween Joseph Seligman and himself before he entered into the
contract for construction. We have carefully examined the
account given of this conversation by the plaintiff himself, and
we see nothing in it which at all compromits the defendants on
the question of their actual *status* and position in the affairs of
the company. Especially may this be said in view of the fact
that, prior to that conversation, an attorney, who had inspected
the contract of Seligmans & Co., told him of it, and that it
would be well for him to have a talk with Joseph Seligman
before entering into contract with the railroad company for its
construction. The general purport of the conversation which
he afterwards had with Seligman was, that Seligman advised
him to take the contract and go on with the work, as the best
thing for all parties, as there would be ample means to get
hold of the local bonds, which would be sufficient to grade the
road. Surely there was nothing in this conversation to estop
the defendants from showing what their real position was with
regard to the stock which they held.

But the appellant's counsel, with much confidence, press
upon our attention the decisions of the Supreme Court of Mis-
souri on the questions involved in this case, and on the very
transactions which we are considering. That court, since the

determination of this case by the Circuit Court, has given judgment in two cases adversely to the judgment in this, and to the views above expressed.   The first case was that of *Griswold* v. *Seligman*, decided in November, 1880 ; the other, that of *Fisher* v. *Seligman*, decided in February, 1882, in which the former case was substantially followed and confirmed.   The case of *Griswold* v. *Seligman* seems to have been very fully and carefully considered.   We have read the opinion of the court and the dissenting opinion of one of the judges with much attention, but we are unable to come to the conclusion reached by the majority.

We do not consider ourselves bound to follow the decision of the State court in this case.   When the transactions in controversy occurred, and when the case was under the consideration of the Circuit Court, no construction of the statute had been given by the State tribunals contrary to that given by the Circuit Court.   The Federal courts have an independent jurisdiction in the administration of State laws, co-ordinate with, and not subordinate to, that of the State courts, and are bound to exercise their own judgment as to the meaning and effect of those laws.   The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference.   Since the ordinary administration of the law is carried on by the State courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the State, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of State constitutions and statutes.   Such established rules are always regarded by the Federal courts, no less than by the State courts themselves, as authoritative declarations of what the law is.   But where the law has not been thus settled, it is the right and duty of the Federal courts to exercise their own judgment ; as they also always do in reference to the doctrines of commercial law and general jurisprudence.   So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the

State tribunals, the Federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the State courts after such rights have accrued.[1] But even in such cases, for the sake of harmony and to avoid confusion, the Federal courts will lean towards an agreement of views with the State courts if the question seems to them balanced with doubt. Acting on these principles, founded as they are on comity and good sense, the courts of the United States, without sacrificing their own dignity as independent tribunals, endeavor to avoid, and in most cases do avoid, any unseemly conflict with the well-considered decisions of the State courts. As, however, the very object of giving to the national courts jurisdiction to administer the laws of the States in controversies between citizens of different States was to institute independent tribunals which it might be supposed would be unaffected by local prejudices and sectional views, it would be a dereliction of their duty not to exercise an independent judgment in cases not foreclosed by previous adjudication. As this matter has received our special consideration, we have endeavored thus briefly to state our views with distinctness, in order to obviate any misapprehensions that may arise from language and expressions used in previous decisions. The principal cases bearing upon the subject are referred to in the note, but it is not deemed necessary to discuss them in detail.[1]

[1] *McKeen* v. *Delancy's Lessee*, 5 Cranch, 22; *Polk's Lessee* v. *Wendal*, 9 id. 87; *Thatcher* v. *Powell*, 6 Wheat. 119; *Preston's Heirs* v. *Bowmar*, id. 580; *Daly's Lessee* v. *James*, 8 id. 495; *Elmendorf* v. *Taylor*, 10 id. 152; *Shelby* v. *Guy*, 11 id. 361; *Jackson* v. *Chew*, 12 id. 153–168; *Fullerton* v. *Bank of United States*, 1 Pet. 604; *Gardner* v. *Collins*, 2 id. 58; *United States* v. *Morrison*, 4 id. 124; *Green* v. *Neal's Lessee*, 6 id. 291; *Groves* v. *Slaughter*, 15 id. 449; *Swift* v. *Tyson*, 16 id. 1; *Carpenter* v. *Providence Washington Insurance Co.*, id. 495; *Carroll* v. *Safford*, 3 How. 441; *Lane* v. *Vick*, id. 464; *Rowan* v. *Runnels*, 5 id. 134; *Smith* v. *Kernochen*, 7 id. 198; *Nesmith* v. *Sheldon*, id. 812; *Williamson* v. *Berry*, 8 id. 495; *Van Rensselaer* v. *Kearney*, 11 id. 297; *Webster* v. *Cooper*, 14 id. 488; *Ohio Life Insurance & Trust Co.* v. *Debolt*, 16 id. 416; *Beauregard* v. *New Orleans*, 18 id. 497; *Watson* v. *Tarpley*, id. 517; *Pease* v. *Peck*, id. 595; *Morgan* v. *Curtenius*, 20 id. 1; *League* v. *Egery*, 24 id 264; *Suydam* v. *Williamson*, id. 427; s. c. 6 Wall. 736; *Leffingwell* v. *Warren*, 2 Black, 599; *Mercer County* v. *Hackett*, 1 Wall. 88; *Gelpcke* v. *City of Dubuque*, id. 175; *Seybert* v. *Pittsburg*, id. 272; *Havemeyer* v. *Iowa County*, 3 id. 294; *Thomson* v. *Lee County*, id. 327; *Christy* v. *Pridgeon*, 4 id. 196; *Mitchell* v. *Burlington*, id. 270; *Lee County* v. *Rogers*, 7 id. 181; *Butz* v. *City of Muscatine*, 8 id. 575; *The City* v.

In the present case, as already observed, when the transactions in question took place, and when the decision of the Circuit Court was rendered, not only was there no settled construction of the statute on the point under consideration, but the Missouri cases referred to arose upon the identical transactions which the Circuit Court was called upon, and which we are now called upon, to consider. It can hardly be contended that the Federal court was to wait for the State courts to decide the merits of the controversy and then simply register their decision; or that the judgment of the Circuit Court should be reversed merely because the State court has since adopted a different view. If we could see fair and reasonable ground to acquiesce in that view, we should gladly do so; but in the exercise of that independent judgment which it is our duty to apply to the case, we are forced to a different conclusion. *Pease* v. *Peck*, 18 How. 595, and *Morgan* v. *Curtenius*, 20 id. 1, in which the opinions of the court were delivered by Mr. Justice Grier, are precisely in point.

The cardinal position assumed by the State court is, that inasmuch as certificates of stock were in fact issued to, and accepted by, J. & W. Seligman, and they voted on the stock, they are absolutely estopped from denying that they are the owners of the stock, subject to all the liabilities incident to that relation; and that they cannot have the benefit of the exception accorded by the law to those who hold stock as collateral security, because, as the court holds, that exemption only applies to those who have received stock in that way from some stockholder who can be made liable as a stockholder, and not to those who have received stock from the corporation itself by way of collateral security.

The first position, that the acceptance of the stock, and voting upon it, absolutely precluded the defendants from denying that they are owners of the stock, has been already considered.

*Lamson*, 9 id. 477; *Olcott* v. *The Supervisors*, 16 id. 678; *Supervisors* v. *United States*, 18 id. 71; *Boyce* v. *Tabb*, id. 546; *Township of Pine Grove* v. *Talcott*, 19 id. 666; *Elmwood* v. *Marcy*, 92 U. S. 289; *State Railroad Tax Cases*, id. 575; *Ober* v. *Gallagher*, 93 id. 199; *Town of South Ottawa* v. *Perkins*, 94 id. 260; *Davie* v. *Briggs*, 97 id. 628; *Fairfield* v. *County of Gallatin*, 100 id. 47; *Oates* v. *National Bank*, id. 239; *Douglass* v. *County of Pike*, 101 id. 677; *Barrett* v. *Holmes*, 102 id. 651; *Thompson* v. *Perrine*, 103 id. 806; s. c. 106 id. 589.

The great mass of authorities relied on by the Supreme Court of Missouri, on this part of the case, English as well as American, are cases in which parties have been held as corporators or associates as between themselves and the corporation, and upon that footing have been held responsible to creditors when the rights of creditors have been in question. We think that we have sufficiently shown that these authorities cannot govern the case in hand if any effect is to be given to the law of Missouri, exempting from personal liability those who hold stock in a fiduciary character or by way of collateral security. We will, therefore, briefly examine the other position, that this law does not apply to those who receive stock as collateral security from the corporation itself.

The argument that the exemption from liability in cases of stock held as collateral security, applies only to those who have received it from third persons who were stockholders and who can be proceeded against as such, seems to us unsound, and contrary both to the words and the reason of the law. It takes for granted that stock cannot be received as collateral security from the corporation itself and still belong to the corporation, and yet we know that such transactions are very common in the business of this country. The words of the statute are positive, and relate to all holders of stock for collateral security. They are as follows : " No person holding stock in any such company as executor, administrator, guardian, or trustee, and no person holding such stock as collateral security, shall be personally subject to any liability as stockholder of such company." The reason of this law is derived from the gross injustice of making a person liable as the owner of stock when he only holds it in trust or by way of security, and from the inexpediency of putting a clog upon this species of property, which will have the effect of making it unavailable to the owner, or of deterring prudent and responsible men from accepting positions of trust where any such property is concerned. It seems to us that not only the law, but the reason upon which it is founded, applies to the holders of stock as collateral security, whether received from an individual or from the corporation itself. It is argued, however, that the remaining words of the law are repugnant to this view. These words are as follows : " But

the person pledging such stock shall be considered as holding the same, and shall be liable as a stockholder accordingly, and the estates and funds in the hands of such executor, administrator, guardian, or trustee shall be liable, in like manner and to the same extent, as the testator or intestate, or the ward or person interested in such fund, would have been if he had been living and competent to act, and held the stock in his own name." The argument is, that these words imply that there must always be some person or estate to respond for the stock, or else the exemption cannot take effect. The obvious answer is, that this clause fixes the liability upon the pledgor as a stockholder, where there is a pledgor who can be made liable in that character. When the corporation pledges its own stock as collateral security, though it cannot be proceeded against as a stockholder *eo nomine*, the reason is because it is primarily liable, before all stockholders, for all its debts. In such a case the clause last quoted would not strictly apply to it; but the holder of its stock as collateral security would be within both the letter and the spirit of the first clause. It is supposed that some flagrant injustice would ensue if there was not some one who could be reached as a stockholder in every case of stock pledged as collateral security; hence, stock pledged by the corporation itself must be regarded as belonging to the pledgee, though no other pledgee of stock is treated in this way. Where is the justice of this? Why should the stock be necessarily considered as belonging to some one besides the corporation itself? Is any one harmed by considering the corporation as its true owner? If the stock had not been issued as collateral security, it would not have been issued at all; it would not have been in existence. Would the creditors have been any better off in such case? They are better off by the issue of the stock as collateral, because the general assets of the company have received the benefit of the moneys obtained by means of the pledge. The more closely the matter is examined, the more unreasonable it seems to deny to a pledgee of the corporation the same exemption which is extended to the pledgee of third persons. We think that the one equally with the other is protected by the express words and true spirit of the law.

We might pursue the subject further, and examine in detail the suggestions and authorities adduced by the learned court which decided the case of *Griswold* v. *Seligman* and *Fisher* v. *Seligman*; but it is unnecessary. What we have said is sufficient to indicate substantially the grounds on which we feel obliged to dissent from its conclusions. In our judgment the facts found by the court below make out a clear case of stock held in trust and by way of collateral security only, and the judgment rendered thereon was correct.

*Judgment affirmed.*