## BARTHOLOMEW v. CITY OF AUSTIN, TEX.

(Circuit Court of Appeals, Fifth Circuit.   February 1, 1898.)

### No. 576.

**1. MONOPOLIES—PRIVILEGES GRANTED WATER COMPANY.**

An ordinance granting to a water company the privilege, not in terms exclusive, of constructing and operating a system of waterworks in a city, for supplying the corporation and its citizens with water, on certain terms and conditions, for a period of 25 years, is not a grant of an obnoxious, exclusive privilege, or the creation of a monopoly, inhibited by public policy or the constitution of Texas, which provides that "perpetuities and monopolies are contrary to the genius of free government and should never be allowed."

**2. FEDERAL COURTS — STATE LAWS AS RULE OF DECISON — DECISIONS NOT BINDING.**

Where contracts or transactions have been entered into, and rights have accrued thereunder, before state laws applicable to them have been construed by the state courts, the federal courts will place their own interpretation on such laws, though the state courts have since adopted a different construction.

**3. EXEMPTION FROM TAXATION—WATER COMPANY—FREE WATER IN LIEU OF TAXES.**

Exempting from municipal taxation the property of a water company, in consideration of the free use of water for municipal purposes, is not in violation of a constitutional provision declaring the property of corporations subject to taxation the same as that of individuals.

**4. CONTRACT—EXEMPTING FROM TAXATION—REMEDY OF PROPERTY OWNER.**

Where a city undertakes to exempt from taxation the property of a water company in consideration of water furnished the city, for certain purposes, if such exemption proves to be void, the company can recover for water furnished under the arrangement.

In Error to the Circuit Court of the United States for the Western District of Texas.

This action was instituted to recover from the city of Austin the sum of $16,900.83 for water supplied and rental of hydrants on a contract entered into between the City Water Company and the city of Austin on the 13th day of April, 1882, which contract was attached to and made a part of the petition, and of which the following is a copy:

"City Water Company Contract with the City of Austin.

"An Ordinance.

"Contract between the City Water Company and the City of Austin.

"This contract, made and entered into this thirteenth day of April, A. D. 1882, by and between the City Water Company, a corporation of the city of Austin, in the county of Travis and state of Texas, party of the first part, and the city of Austin, a body corporate of the county of Travis in the state of Texas, party of the second part, witnesseth:

"Whereas, the city council of the city of Austin deem it necessary to provide for a more effective protection of the property of taxpayers of the said city from fire; and for the further purposes of extending such protection to a larger number of taxpayers, and also to secure to the citizens of the said city a supply of water suitable for domestic purposes, and for the further benefits of the city of Austin, hereinafter mentioned; and, in accordance with the seventh and twentieth paragraphs of section 1 of article six (6) of the charter of the city of Austin, together with the other powers contained in said article six (6):

"Therefore, be it ordained by the city council of the city of Austin:

"Section 1. That there is hereby given and granted to the City Water Company the right and privilege for the term of twenty years from the date of the

execution of this contract, of supplying the city of Austin and the citizens thereof with water by a system of waterworks constructed upon the method of supplying a city with water, either for domestic use or for the extinguishment of fire, that is to say, by pumping the water directly into the mains with contrivances by which the pressure on those mains may be increased or diminished, or preserved uniform.

"Sec. 2. The said company is hereby authorized to establish, construct, maintain and operate said works in said city of Austin; to receive, take and store, construct and distribute water through the city; to construct and extend aqueducts, mains and pipes through all the streets, alleys, lanes and public grounds, across any stream or bridges in said city; to erect and maintain all engines, machinery and other appliances necessary for the proper conducting of said works, and for supplying said city and the inhabitants thereof with water for domestic, manufacturing, fire and other purposes. The said City Water Company shall have the right to take up all pavements or sidewalks on streets, alleys, lanes or public grounds, and make such excavation therein as may be necessary to lay, repair and maintain aqueducts and pipes below the surface of the ground for conveying and distributing said water as aforesaid; provided, that said company shall, within a reasonable time, replace and repair all pavements and sidewalks and fill all such excavations and restore the streets in as good condition as they were in before.

"Sec. 3. That said company shall be liable for all damages occasioned by a failure to guard and protect persons and property from injury by reason of the removal of such pavements and sidewalks, or the making of such excavations as aforesaid. The rights and liabilities provided for in this contract shall continue for a period of twenty years, unless sooner extinguished by purchase as hereinafter provided.

"Sec. 4. The said waterworks shall be constructed with pumps of not less capacity than three million gallons in twenty-four hours, and also to produce the fire streams hereinafter mentioned, the pumps shall be what is known as the quadruplex compound condensing pumping engines of the Holly Company, and there shall be in addition an auxiliary, or reserve high pressure pump of the same capacity, making an aggregate easy working capacity of five million gallons per day.

"Sec. 5. The said City Water Company shall lay six miles of mains and pipes, more or less, as shown on the plat which makes a part of this contract, and is marked 'Exhibit A,' for the distribution of water in said city, in addition to the mains and pipes already in use. The mains and pipes used in this extension shall be of proper sizes, and the said City Water Company shall replace such of its mains now in use with such other mains and pipes as to secure, in connection with the extensions herein mentioned, an easy flow of water through the entire system of mains, and to comply with all the conditions of this contract: such mains shall be from four inches to sixteen inches in their inner diameter, and shall be of standard weight and strength to insure the fire streams hereinafter mentioned.

"Sec. 6. The said city of Austin snall, by a vote of the city council, have the right to take up any of the hydrants on the mains and pipes now in use and relocate them upon the extensions designated in section 5, and the said city of Austin shall also order twenty-five hydrants at the expense of the City Water Company, in addition to the number now in use, to be located upon said extensions, making in all one hundred hydrants upon the entire pipe distribution herein contemplated. The city of Austin hereby agrees to pay said City Water Company an annual rental of one hundred dollars for each of said one hundred hydrants, for the purposes contemplated in this contract, which said rental shall be paid semiannually on the first of July and January of each year in a warrant drawn on the city treasurer, that is to say, at the end of each half year or six months, during the full time specified in this contract, the first payment for each of these hydrants to become due and payable at the end of six months, after each of such hydrants is placed in position and ready for use; and, for the purpose of providing for the payment of all hydrant rental becoming due under the provisions of this contract, the city council shall annually make an appropriation sufficient to pay the same out of the first moneys not otherwise appropriated, arising from the general revenue of the city.

"Sec. 7. For all extensions of mains which the city may hereafter order, in

addition to the extensions contemplated in this contract, the said company shall erect not less than ten (10) fire hydrants to the mile, for which the city shall pay a rental of fifty dollars a year for each hydrant so ordered and erected, payments to be made as hereinbefore mentioned.

"Sec. 8. None of the hydrants from which fire streams are to be taken, as hereinafter provided, shall be located upon pipes or mains of less than four inches in their inner diameter. The said City Water Company shall permit any owner or occupant of any building to erect standpipes and connect the same with the mains hereby authorized to be laid, or any main hereafter laid by order of the council of the said city of Austin, under the provisions of this contract, and they shall have the use of water through such standpipes and connections for the prevention and extinguishment of fires, free of charge, upon giving the said City Water Company a written agreement that they will not use the water from said pipes and connections for any other purposes whatever. The said city of Austin shall have the right to erect and connect twenty-five fire hydrants to the mains, at any time, under the provisions of this contract, at the expense of the said water company, and use the same for the prevention and extinguishment of fires, free of charge, provided always, that the said city of Austin shall first pay a rental on the first one hundred (100) hydrants contemplated in this contract. The city of Austin shall have the right to connect standpipes to the mains of all extensions ordered by the city, after first paying a rental for at least ten (10) hydrants for every mile of such extensions. The owner or occupant of any property may also connect standpipes or hydrants with the mains, upon the city paying the rental hereinbefore mentioned. As soon as the works are completed the said City Water Company shall cause the fire streams hereafter specified to be produced in the presence of the city council, or such committee as the council may appoint, which test shall take place within five (5) days after the completion of said works. At the first meeting of the council, after the full and faithful performance of the tests hereinafter specified, the city council shall accept the works and the date of such acceptance shall be the time at which the city shall commence to pay the rental for the hydrants at that time located.

"Sec. 9. Said waterworks when constructed shall have the capacity of discharging six (6) fire streams at the same time, through one (1) inch nozzles, from any six (6) hydrants located upon pipes not less in size than four inches in their inner diameter, through fifty feet of two and one-half inch hose, to a height of one hundred (100) feet, or to maintain its equivalent in pressure at the nozzle of said hydrants, so long as it may be necessary for the extinguishment of any fires. There shall be always sufficient pressure for all domestic demands.

"Sec. 10. The City Water Company furthermore agrees to put new hydrants in the place of old ones so as to make the nozzle connections for hose uniform throughout the whole one hundred and twenty-five hydrants located and to be located on the mains and pipes, as shown on the plat accompanying this proposition.

"Sec. 11. The city shall have the right to use the water, free of charge, from the hydrants for the purpose of flushing gutters and sewers whenever the council shall deem it necessary for sanitary purposes, upon giving notice to the persons in charge of said waterworks; the city shall also have water free of charge for the fire department buildings, city hall, and offices occupied for city purposes, for all public schools of the city, for fifteen public watering places for man and beast, and also for one fountain in each park and public ground, the jets of which shall not exceed in volume one-sixteenth (1-16) of an inch orifice, and not to run to exceed six hours a day for eight months in the year, and shall also have water free of charge for the uses and purposes of the city cemetery; in consideration for all of which, the property of the City Water Company shall be, and the same is hereby, exempted from municipal taxation during the full term for which this contract is executed.

"Sec. 12. The water rates to consumers shall not exceed two (2) cents per barrel of forty (40) gallons each.

"Sec. 13. The city of Austin shall have the right to acquire by purchase, and become the sole owner of said waterworks, including all grounds, machinery, mains, pipes, buildings and property thereto appertaining, at the expiration of ten (10) years, or at any time thereafter, upon giving one year's notice of such intention, upon paying therefor to owners thereof the value of said property, to be ascertained by appraisal as follows, to wit: Said city shall select one com-

petent person, and the owners of the works another, and the two (2) so selected shall select a third, or, in case they cannot agree upon such third person, a third person shall be appointed by the judge of the district court of Travis county, and the three men so determined upon shall appraise the value of said property, exclusive of franchise, at its then cash value, which appraisal shall be binding upon both parties as to the value thereof, and said city shall have the right to purchase and become the absolute owner of said works and property at such appraised value, which value shall not be less than the actual value of the works at that time. In case the city does not purchase and become the owner of said works and property as aforesaid, at the expiration of twenty (20) years, then all the rights and privileges in this contract granted to said City Water Company shall be extended to said company, its successors and assigns for a further term of twenty (20) years thereafter, subject to the right of the city to purchase as aforesaid, and subject to all the duties, liabilities, obligations and penalties herein provided for: provided, however, that if, at the time of such purchase by the city, said works and franchises shall be incumbered by mortgage or otherwise, the said city shall assume and pay such liability as part of the appraised value as aforesaid made and ascertained.

"Sec. 14. It is hereby agreed by and between the City Water Company and the city of Austin, that so much of the hydrant rental to be paid by the city of Austin under the provisions of this contract, as will fully pay the interest on all outstanding bonds of the City Water Company, and all bonds that may hereafter be issued by the said City Water Company, shall be paid to the holders of such bonds, through their trustee, at the times specified in this contract for the payment of such hydrant rental to said company, so long and until all such bonds are fully paid and canceled, and the balance of the hydrant rental due from the city shall be paid to the said City Water Company. It being understood that the hydrant rental which the city of Austin agrees to pay to the said company for fire protection, or so much of said amount as shall be necessary to pay the interest on such bonds, shall be set aside and paid to the trustee of such bonds, and by him used exclusively and only for the payment of interest on such bonds when and so long as the same shall become due and payable, but in no event shall the city of Austin pay to said trustee, for such interest, a sum greater than the amount agreed to be paid to the City Water Company.

"Sec. 15. That the city of Austin agrees to prevent the use of water from such hydrant, by itself, citizens or corporations, except for the purposes specified in this contract. That the said city shall make all ordinances, appropriations, etc., necessary to secure the City Water Company in the rights and privileges granted in this agreement, so long as the same may be in force. That either or both of the parties to this contract may be represented by officers, agents, assigns or successors, who may be legally authorized to act and represent them severally or jointly as authorized. Now, therefore, these presents witness, that the said party of the first part, for and in consideration of the rights, privileges and agreements herein specified, hereby covenants and agrees to and with the said party of the second part, by its president, M. D. Mather, that it will faithfully keep and abide by the provisions of this contract and will faithfully and fully discharge, perform, fulfill and carry out all the duties, obligations, powers and all other matters and things by it in said contract provided to be done and performed, and the said party of the second part on its part hereby covenants and agrees to, and with the said party of the first part, that it will faithfully keep and abide by the provisions of this contract and shall and will faithfully and fully discharge and perform, fulfill and carry out the matters and things of every kind whatsoever, by it in said contract provided to be done and performed.

"Sec. 16. All previous contracts with the water company shall be void after the completion and acceptance of the waterworks as specified in this contract.

"Sec. 17. That the mayor of the city of Austin be and is hereby authorized and instructed, in behalf of the city of Austin, to sign a certain agreement made and entered into by and between the City Water Company of the city of Austin, through M. D. Mather, president of said City Water Company, and the city of Austin, on this the 13th day of April, A. D. 1882, and the mayor of said city of Austin is hereby authorized, empowered and directed to carry out and enforce all the provisions contained in said agreement.

"Sec. 18. That this ordinance take effect and be in force from and after its passage.

"In witness whereof, we, M. D. Mather, president of said City Water Company, and W. A. Saylor, mayor of the city of Austin, have hereunto signed our names, with official letter affixed, using in one case a scroll for seal, and in the other the official seal of the city of Austin.

"Done at the city of Austin, Texas, on this the 13th day of April, A. D. 1882.

"Passed April 11, 1882. Approved April 13, 1882."

The recovery sought is for services rendered under the sixth, seventh, eighth, and eleventh sections of the foregoing contract. The defendant, the city of Austin, entered an appearance, and demurred generally to the petition as insufficient in law, and specially excepted to the said petition on the following grounds:

"(1) It is not alleged therein what officer or officers of said city entered into the alleged contract on its behalf, or under or by what authority said contract was made. (2) Said contract is not set out in such manner as to enable the court to understand all the terms and conditions thereof. (3) There are no averments in the petition showing any liability on the part of defendant to pay the item of $1,250 for water furnished twenty-five hydrants. (4) No facts are alleged which would authorize this court to render judgment in favor of plaintiff for the item of $3,369.33, alleged to be the amount assessed by defendant against the property of plaintiff as taxes due for the year 1896; and, further, because it does not appear from said petition whether said taxes are assessed against the property of the City Water Company, of the Austin Water, Light & Power Company, or of the receiver individually. (5) Section 11 of said contract, in so far as the same attempts to exempt the property of the City Water Company from taxation, was, at the date thereof, and is now, wholly void, as said city had no power, under the constitution and laws of the state of Texas or its charter, to make such exemption. (6) Said alleged contract is void because the same created a monopoly. (7) Said contract is void because the same attempts to create a debt without at the same time making provision to create a sinking fund and to pay interest thereon, and because there is no allegation in said petition that, at the time of said contract, defendant had under its control any funds to meet the debt created by said contract. (8) It appears from said contract set out in said petition that the plaintiff is entitled to be paid only out of the general revenue of defendant not otherwise appropriated, and there is no allegation that defendant had on hand when this suit was brought, or at any time prior thereto, any money out of which plaintiff's claim could lawfully be paid."

The cause coming on to be heard, the circuit court overruled the general demurrer, and the first, second, third, seventh, and eighth special exceptions, but sustained the fourth, fifth, and sixth special demurrers; and thereupon, the plaintiff declining to amend, dismissed the action; to which ruling of the court the plaintiff took a bill of exceptions, and thereupon sued out this writ of error.

W. M. Walton and T. W. Gregory, for plaintiff in error.

Geo. F. Pendexter, for defendant in error.

Before PARDEE and McCORMICK, Circuit Judges, and NEW-MAN, District Judge.

PARDEE, Circuit Judge, after stating the facts as above, delivered the opinion of the court.

The contract on which this action is based is a grant and privilege for a period of 20 years to the City Water Company to supply water to the city of Austin, and the inhabitants thereof, with the right of extension under certain named contingencies. The grant is not in terms an exclusive one, and, so far as the language used is concerned, there is nothing to hinder the city of Austin from erecting other and competing works, nor from granting to others the right to use the streets, nor from

contracting with others for the furnishing of more water, as the needs of the city may require. It is very well settled that, in contracts with states or municipalities conferring powers, grants, or privileges on private corporations affecting the general rights and interests of the public, the grant or privilege must be clearly conferred, all implications, doubts, and ambiguities being resolved against the grant or privilege claimed. Richmond, F. & P. R. Co. v. Louisa R. Co., 13 How. 71, 81; Rice v. Railroad Co., 1 Black, 358, 380; Bank v. Skelly, Id. 436, 446; Stein v. Supply Co., 141 U. S. 67, 80, 11 Sup. Ct. 892.

In the leading case of Richmond, F. & P. R. Co. v. Louisa R. Co., supra, the proposition is thus stated:

"This act contains the grant of certain privileges by the public to a private corporation, and in a matter where the public interest is concerned: and the rule of construction in all such cases is now fully established to be this: That any ambiguity in the terms of the contract must operate against the corporation, and in favor of the public, and the corporation can claim nothing but what is clearly given by the act."

In the late case of Stein v. Supply Co., supra, it is said:

"If the contract under which the plaintiff claims was doubtful in its meaning, the result would not be different; for, while it is the duty of the courts not to defeat the intention of parties to a contract by a strained interpretation of the words employed by them, it is a settled rule of construction that, 'in grants by the public, nothing passes by implication'; and 'if, on a fair reading of the instrument, reasonable doubts arise as to the proper interpretation to be given to it, those doubts are to be solved in favor of the state; and, where it is susceptible of two meanings, the one restricting and the other extending the powers of the corporation, that construction is to be adopted which works the least harm to the state.' In re Binghamton Bridge, 3 Wall. 51, 75. Guided by this rule, in respect to which there is no difference of opinion in the courts of this country, we are forbidden to hold that a grant, under legislative authority, of an exclusive privilege, for a term of years, of supplying a municipal corporation and its people with water drawn by means of a system of waterworks from a particular stream or river, prevents the state from granting to other persons the privilege of supplying, during the same period, the same corporation and people with water, drawn in like manner from a different stream or river."

A "monopoly," as understood in law, is defined by Mr. Justice Story as "an exclusive right granted to a few of something which was before of common right,"—citing 4 Bl. Comm. 159; Bac. Abr. "Prerogative," F 4; and quoting Lord Coke in his Pleas of the Crown (3 Inst. 181), to the effect that a monopoly is "an institution by the king, by his grant, commission, or otherwise, to any persons or corporations, of or for the sole buying, selling, making, working, or using of everything, whereby any persons or corporations are sought to be restrained of any freedom or liberty they had before, or hindered in their lawful trade"; and concluding that "it is not the case of a monopoly if the subjects had not the common right or liberty before to do the act, or possess or enjoy the privilege or franchise granted as a common right." Charles River Bridge v. Warren Bridge, 11 Pet. 419, 607.

Of course, if the contract under consideration is not exclusive, it can in no sense be taken as a monopoly, and, even if it be an exclusive contract, it would seem that, under the definition of Mr. Justice Story, it cannot be considered as granting a monopoly in law.

The case of New Orleans Gaslight Co. v. Louisiana Light & Heat-Producing & Manufacturing Co., 115 U. S. 650, 6 Sup. Ct. 252, arose

from the conflicting interests of two gas companies, the older of which had been granted, in express terms, an exclusive privilege of supplying the city of New Orleans and the people thereof with gas, and the suit was to enjoin the junior company from building its works to compete with complainant's. Mr. Justice Harlan, the organ of the court in that case, uses language as follows:

"Legislation of that character is not liable to the objection that it is a mere monopoly, preventing citizens from engaging in an ordinary pursuit or business, open as of common right to all, upon terms of equality: for the right to dig up the streets and other public ways of New Orleans, and place therein pipes and mains, for the distribution of gas for public and private use, is a franchise, the privilege of exercising which could only be granted by the state, or by the municipal government of that city acting under legislative authority. Dill. Mun. Corp. (3d Ed.) § 691; State v. Cincinnati Gaslight & Coke Co., 18 Ohio St. 262. See, also, Boston v. Richardson, 13 Allen, 146. To the same effect is the decision of the supreme court of Louisiana in Crescent City Gaslight Co. v. New Orleans Gaslight Co., 27 La. Ann. 138, 147, in which it was said: 'The right to operate gasworks, and to illuminate a city, is not an ancient or usual occupation of citizens generally. No one has the right to dig up the streets, and lay down gas pipes, erect lamp posts, and carry on the business of lighting the streets and the houses of the city of New Orleans, without special authority from the sovereign. It is a franchise belonging to the state, and, in the exercise of the police power, the state could carry on the business itself or select one or several agents to do so.' * * * In Bridge Proprietors v. Hoboken Co., 1 Wall. 116, it was decided that a statute of New Jersey empowering certain commissioners to contract for the building of a bridge over the Hackensack river, and providing, not only that the 'said contract should be valid on the parties contracting as well as on the state of New Jersey,' but that it should not be lawful 'for any person or persons whatsoever to erect any other bridge over or across the said river for ninety-nine years,' was a contract whose obligation could not be impaired by a law of the state. Mr. Justice Miller, delivering the opinion of the court, after observing that the parties who built the bridges had the positive enactment of the legislature, in the very statute which authorized the contract with them, that no other bridge should be built, and that the prohibition against the erection of other bridges was the necessary and only means of securing to them the benefit of their grant, said: 'Without this they would not have invested their money in building the bridges, which were then much needed, and which could not have been built without some such security for a permanent and sufficient return for the capital so expended. On the faith of this enactment, they invested the money necessary to erect the bridges. These acts and promises on the one side and the other are wanting in no element necessary to constitute a contract.' "

### And this from the Binghamton Bridge Case is quoted with approval:

"The purposes to be attained are generally beyond the ability of individual enterprise, and can only be accomplished through the aid of associated wealth. This will not be risked unless privileges are given and securities furnished in an act of incorporation. The wants of the public are often so imperative that a duty is imposed on the government to provide for them; and, as experience has proved that a state should not directly attempt to do this, it is necessary to confer on others the faculty of doing what the sovereign power is unwilling to undertake. The legislature, therefore, says to public-spirited citizens: 'If you will embark, with your time, money, and skill, in an enterprise which will accommodate the public necessities, we will grant to you, for a limited period, or in perpetuity, privileges that will justify the expenditure of your money and the employment of your time and skill.' Such a grant is a contract, with mutual considerations, and justice and good policy alike require that the protection of the law should be assured to it."

In Charles River Bridge Co. v. Warren Bridge Co., supra, we have the authority of Mr. Justice Story as follows:

"No sound lawyer will, I presume, assert that the grant of a right to erect a bridge over a navigable stream is a grant of a common right. Before such grant, had all the citizens of the state a right to erect bridges over navigable streams? Certainly they had not, and therefore the grant was no restriction of any common right. It was neither a monopoly, nor, in a legal sense, had it any tendency to a monopoly. It took from no citizen what he possessed before, and had no tendency to take it from him. It took, indeed, from the legislature, the power of granting the same identical privilege or franchise to any other persons. But this made it no more a monopoly than the grant of the public stock or funds of a state for a valuable consideration."

There is a long line of cases that affirm the independence and freedom of contracts like the one under consideration from the objection that they are void because a supposed monopoly is embodied in them, and many are cited in the briefs; but a review of them is not essential to illustrate our views, which are that the contract forming the basis of the plaintiff's action in this case cannot and ought not to be construed as in any just sense granting an obnoxious exclusive privilege, or as granting to the City Water Company any monopoly inhibited either by public policy or by the provisions of the constitution of the state of Texas, wherein it is declared that "perpetuities and monopolies are contrary to the genius of free government, and should never be allowed." Ordinarily, this would be conclusive in this case; but we find that five years after the rights in question were granted to the City Water Company, under a general state of the law that such contracts were meritorious and valid, and after the induced and necessary capital had been invested, the works organized and accepted by the city of Austin, and negotiable bonds had been floated on the market, secured by mortgage on the said works, with the direct consent of the city of Austin, as evidenced by the provisions of the contract, the supreme court of the state of Texas in City of Brenham v. Brenham Water Co., 67 Tex. 542, 4 S. W. 143, in dealing with a contract in all material respects similar to the one involved in this case, held that, although no exclusive privilege was in terms granted, yet necessarily the effect of the contract was to grant an exclusive privilege, and, further, that the contract thus necessarily granting an exclusive privilege was the granting of a monopoly, in violation of the constitution of the state of Texas. The opinion filed in the case by the learned supreme court was very elaborate, and purports to review the general jurisprudence on the subject; but for the reasons hereinbefore given, with all respect, we are compelled to differ from the reasoning and conclusion of the court.

The court below appears to have followed City of Brenham v. Brenham Water Co. in disposing of the present case, and the question is thus presented for our solution whether the decision of the supreme court of Texas declares a question of local policy, and presents a construction of the constitution of the state of Texas which the courts of the United States in similar cases are bound to follow. The general rule is declared in Claiborne Co. v. Brooks, 111 U. S. 410, 4 Sup. Ct. 489; Detroit v. Osborne, 135 U. S. 492, 497–499, 10 Sup. Ct. 1012; Flash v. Conn, 109 U. S. 371, 3 Sup. Ct. 263; and in many others cited on the briefs.

The precise question in this case appears to have received elaborate and careful consideration in Burgess v. Seligman, 107 U. S. 33, 2 Sup.

Ct. 10, where, after a review of the authorities in a case where two decisions of the supreme court of the state of Missouri, construing a statute of the state, had been rendered after rights under the statute had been acquired, the supreme court of the United States declared as follows:

"We do not consider ourselves bound to follow the decision of the state court in this case. When the transactions in controversy occurred, and when the case was under the consideration of the circuit court, no construction of the statute had been given by the state tribunals contrary to that given by the circuit court. The federal courts have an independent jurisdiction in the administration of state laws, co-ordinate with, and not subordinate to, that of the state courts, and are bound to exercise their own judgment as to the meaning and effect of those laws. The existence of two co-ordinate jurisdictions in the same territory is peculiar, and the results would be anomalous and inconvenient but for the exercise of mutual respect and deference. Since the ordinary administration of the law is carried on by the state courts, it necessarily happens that by the course of their decisions certain rules are established which become rules of property and action in the state, and have all the effect of law, and which it would be wrong to disturb. This is especially true with regard to the law of real estate and the construction of state constitutions and statutes. Such established rules are always regarded by the federal courts, no less than by the state courts themselves, as authoritative declarations of what the law is. But, where the law has not been thus settled, it is the right and duty of the federal courts to exercise their own judgment, as they also always do in reference to the doctrines of commercial law and general jurisprudence. So when contracts and transactions have been entered into, and rights have accrued thereon under a particular state of the decisions, or when there has been no decision, of the state tribunals, the federal courts properly claim the right to adopt their own interpretation of the law applicable to the case, although a different interpretation may be adopted by the state courts after such rights have accrued."

Applying the principles thus declared in Burgess v. Seligman, supra, —which, by the way has never been questioned in the supreme court,— we conclude that, for the purposes of this case, the decision in City of Brenham v. Brenham Water Co., supra, should not control our decision in the present case.

The fourth and fifth special exceptions, the ruling on which is assigned as error, relate to the item for $3,369.33, claimed as follows:

"To water for flushing the gutters, for fire buildings, city hall and office, public schools, fifteen public watering troughs, city cemetery, for the year ending December 31, 1896, amounting to the company's municipal tax for same year. Value of plant as appraised by the city's equalization board, $190,000; rate of taxation, $1.77⅛, as per section 11 of contract."

In regard to this item the petition sets out:

"That under and by the terms of section 11 of the said contract it was mutually agreed and understood and contracted between the parties to said contract that the furnishment of water by the said water company to the said city of Austin (for the several purposes named in the item above), year by year, the said City Water Company should be compensated therefor in a sum equal to the amount of taxes that might, from year to year, be, and which were, year by year, assessable against the works, property, and plant of said City Water Company, by said city of Austin, according to its yearly rate of taxation. That up to January 3, 1893, it was the custom, habit, practice, and dealing between the City Water Company until 1887, and from thence to the first date just above, to pass accounts under section 11 of contract, on the first of the year, yearly receipted,—that is to say, the said companies successively would tender their check for cash for the sum of taxes due from City Water Company to defendant, and defendant would tender its warrant back for an equal sum as payment for water under said section 11; thus each party in good (faith) construing

and fairly complying with the terms of said section according to its true intent, purpose, and meaning on this subject-matter; but that defendant city, in violation of said section 11 of said contract, is seeking to collect taxes from plaintiff against the waterworks plant and fixtures (entirely exclusive of electrical appliances and plant), the sum of $3,369.33, and has refused to pay for said water under section 11, or to allow an offset, the agreed contract price, under the terms, arrangements, and agreements set out in said section 11 and practiced up to January 1, 1893. That plaintiff in all things fully complied with its contract, including section 11, for furnishing water ready for reception and use on the water contract to be furnished, and is therefore entitled to recover," etc.

The exceptions are, in effect, that section 11 is an exemption of the property of the water company from taxation, which is contrary to and not allowed by law; and, further, that the allegations of the petition are not sufficient to warrant a recovery, even if otherwise a recovery could be had. The second view of the exception is unimportant, for, if a recovery can be had under section 11, the pleadings can be amended, if they are not sufficient as they are. We do not construe the contract as granting an exemption from taxation. "Exemption" means free from liability, from duty, from service. It is a grace, a favor, an immunity; taken out from under the general rule, not to be like others who are not exempt; to receive, and not make a return. This being the meaning of the term, the transaction presented in section 11 is not an exemption from taxation. The city needed the water for the several purposes named. To supply it required time, expense, and labor. These things were of value. The taxes to be levied were to be legal obligations for money. The obligations were of value. On a comparing of values, the parties being competent to contract, it was concluded that the values were equal, and the one should be offset by the other. There is no claim that the one value was not as great as the other. No imposition on the one hand, nor favoritism on the other, can be inferred.

In Grant v. City of Davenport, 36 Iowa, 405, 406, it is said:

"The last clause of section 12 of the ordinance provides: 'And in consideration of the foregoing provisions, the said company during the term of twenty-five years shall be exempt from municipal taxation on the franchise hereby granted, and all property owned by said company and actually required for the economical management of the works aforesaid.' This portion of the ordinance, it is claimed, is violative of the constitution, which declares that the property of corporations shall be liable to taxation the same as individuals. If we placed the same construction upon the ordinance as the counsel for appellants seem to, we should probably conclude with him in his legal positions and conclusions thereon. But it seems to us that, when the whole ordinance is construed together, it does not amount to an exemption from taxation. It, in effect, applies the taxes as they would otherwise become due in part payment or in part consideration of the water rent. The city pays the amount of money specified and the taxes on the franchise, and the property required for the management of the works, as water rent. It might have required the payment of the taxes, and then returned the amount as part pay for water rent. The manner of doing it cannot defeat the power to do it."

The difference between the ordinance thus considered and the one here is that one used the words "shall be exempt," while this provides that the freedom from taxes shall be in "consideration" for water used for the various purposes named. See Portland v. Water Co., 67 Me. 135, 137; Illinois Cent. R. Co. v. McLean Co., 17 Ill. 291; Illinois Trust & Sav. Bank v. City of Arkansas, 22 C. C. A. 171, 76 Fed. 271.

Even if section 11 should be construed as granting an exemption from taxation, and therefore void, the contract is not necessarily and thereby void, and for water actually furnished by the City Water Company, under section 11, a recovery may be had on a quantum valebant. The judgment of the circuit court is reversed, and the case remanded, with instructions to overrule the general demurrer and special exceptions to the plaintiff's petition, and thereafter proceed according to law and in conformity with the views herein expressed.