PETERSON et al. v. METROPOLITAN LIFE INS. CO. et al.

District Court, S. D. Iowa, W. D. March 10, 1926.

No. 4120.

1. Cancellation of instruments ⬅═30—Borrower not receiving proceeds of loan negotiated by local loan company, acting as trust company's agent in applying funds advanced, may cancel mortgage as against trust company and assignee of nonnegotiable note.

Local loan company *held* borrower's agent for negotiating building loan, on paper ·purchased by insurance company through trust company, but also trust company's agent to receive, disburse, and see to application of proceeds, and borrower, not receiving proceeds of nonnegotiable note and mortgage, was entitled to cancellation as against trust company and insurance company.

2. Courts ⬅═366(1)—Federal courts are bound by state court decisions construing local statutes.

On questions of construction of state statute, local in its nature, federal courts deem themselves bound by decisions of highest court of state.

3. Courts ⬅═372(1)—Federal courts are not bound by state court decisions on general principles of commercial law.

Federal courts, in their recognition and application of general principles of commercial law, are not bound by decisions of state courts.

4. Courts ⬅═372(1)—Federal courts will recognize state statutes modifying general commercial law principles, and will follow state court decisions interpreting such legislation.

· Where state Legislature by statute has modified principles of general commercial law, federal courts will recognize such modification, and, to extent that such legislation is modified, federal courts will follow highest court of state in its interpretation of such modified legislation.

5. Courts ⬅═372(4)—Federal courts are not bound by state court decisions interpreting contracts, unless rules of property have been settled by local interpretation.

Federal courts are not to be deemed bound by decisions of highest courts of states on questions of interpretation of contracts, except where by their settled local interpretation rules of property have been established.

6. Courts ⬅═372(1)—Federal courts are not bound by state court decisions construing statute declaratory of common law.

Federal courts will not be deemed bound by decisions of state courts in their construction of statutes which are merely declaratory of common law.

7. Courts ⬅═372(7)—Federal court is bound only by superior federal court decisions in determining note's negotiability, where state law merely declares principles of commercial law (Iowa Negotiable Instrument Law).

Where Iowa Negotiable Instrument Law (Acts 29th Gen. Assem. c. 130), so far as bear-

ing on negotiability of particular note, is merely declaration of well-settled principles of commercial law, federal court, in determining negotiability of note, is bound only by decisions of superior federal court.

**8. Bills and notes ⬳161—Note incorporating mortgage authorizing holder to pay taxes in default, for which note was security, held nonnegotiable, as being uncertain in amount (Iowa Negotiable Instrument Law).**

Note incorporating provisions of mortgage authorizing holder, on default in payment of taxes, to pay same, and requiring makers to repay such amount on demand, note to stand as security therefor, *held* nonnegotiable, as being uncertain in amount, as contemplated by the law merchant and the Negotiable Instrument Law of Iowa (Acts 29th Gen. Assem. c. 130).

**9. Estoppel ⬳83(3)—Owner held not estopped to sue to cancel mortgage because of membership in firm examining title and certifying mortgage was first lien thereon.**

Owner of property *held* not estopped to bring suit for cancellation of mortgage thereon, because of receiving only partial payment of consideration by reason of fact that firm of attorneys of which owner was a member examined the abstract of title to mortgaged premises, and certified that fee-simple title was shown in owner, and that mortgage in question was a first lien thereon, since the opinion rendered by such firm related entirely to record title as shown by abstract.

In Equity. Suit by John L. Peterson and another against the Metropolitan Life Insurance Company and others, wherein the defendant named filed a cross-bill, after removal from state court. Decree for plaintiffs, and cross-bill dismissed.

Decree affirmed, 19 F.(2d) 88.

Kimball, Peterson, Smith & Peterson, of Council Bluffs, Iowa, for plaintiffs.

Tinley, Mitchell, Ross & Mitchell, of Council Bluffs, Iowa, and Morsman, Maxwell & Haggart, of Omaha, Neb., for defendants.

SCOTT, District Judge. On January 25, 1924, John L. Peterson and Helen Louise Peterson, as plaintiffs, filed their petition in equity in the district court of Iowa for Pottawattamie county, naming therein as defendants the Metropolitan Life Insurance Company, a New York corporation, hereinafter referred to as the "Insurance Company," the United States Trust Company, a Nebraska corporation, hereinafter referred to as the "Trust Company," Robert B. Wallace Company, an Iowa corporation, hereinafter referred to as the "Wallace Company," and Frank H. Binder, trustee in bankruptcy of the Wallace Company.

Plaintiffs in substance allege that about April 27, 1923, they negotiated with the Wallace Company for the securing of a loan of $4,500 upon lot 54, Forest Park addition, Council Bluffs, Iowa, and executed and delivered a written application, promissory note, and mortgage in connection with said negotiations; that all of said instruments were executed as a part of said transaction and are nonnegotiable.

Plaintiffs' petition exhibits the mortgage, but alleges the application and note to be in possession of defendants, and plaintiffs' inability to set forth copies; that about the 11th day of May, 1923, the Wallace Company filed the mortgage for record and made written assignment thereof to the Trust Company, and that the Trust Company, on the 14th day of May, 1923, made written assignment thereof to the Insurance Company, both of said assignments being filed for record on the 15th day of May, 1923; that plaintiffs received only partial payment of the consideration, in the amount of $1,941.43, and the balance of $2,558.57, although demanded of the defendants through the Wallace Company, defendants have failed and neglected to pay.

Plaintiffs offer to repay and tender into court the amount received for the benefit of all defendants who may have paid the same, and aver their willingness to pay such amount, or whatever sum they may be adjudged to have received. Plaintiffs then pray for a cancellation of the mortgage and the quieting of their title as against the cloud created thereby, and for general equitable relief.

All defendants, except the Trust Company, acknowledged service of the original notice and later appeared. The Trust Company, though regularly served in the state of Nebraska, has never appeared. Within the proper time the Insurance Company filed its petition, bond, and notice, with service duly indorsed, in the district court of Pottawattamie county, for removal of this cause to this court upon the ground of separable controversy, and thereupon the cause was removed, and the Insurance Company filed herein its answer and cross-bill.

As no point is made in the record against either the form or substance of the answer, I shall content myself with merely stating the nature of the defenses pleaded. The Insurance Company, after denying the nonnegotiability of the note and the nonreceipt by plaintiffs of the proceeds, pleaded three defenses: First, that it is a purchaser of the note and mortgage and a holder thereof in due course; second, that plaintiffs are estopped by reason of the fact that John L. Peterson was at the time in question a mem-

ber of the law firm of Kimball, Peterson, Smith & Peterson, of Council Bluffs, Iowa, and that that firm examined the abstract of title to the mortgaged premises for the Wallace Company, and on May 18, 1923, certified that the fee-simple title to said premises was shown by said abstract to be in John L. Peterson, and that the mortgage in question was a first lien thereon, and that the Insurance Company, relying thereon, purchased said note and mortgage from the Trust Company; and, third, that the Wallace Company was plaintiffs' agent to negotiate said loan and to receive and disburse the proceeds thereof, and that the Wallace Company received the full proceeds of said loan.

The Insurance Company then, by way of cross-bill, alleges the execution and delivery of said note and mortgage by plaintiffs to the Wallace Company, the sale and assignment thereof by the Wallace Company to the Trust Company, and the sale and assignment thereof by the Trust Company to it, the Insurance Company, and that it is a holder of said paper in due course. Said defendant alleges the default of payment of interest, the acceleration of the maturity of the paper by reason thereof, and prays that plaintiffs' action be dismissed, and that defendant have judgment for the amount of the promissory note, and that said mortgage be foreclosed, and for general equitable relief.

The plaintiffs replied to the answer and cross-bill, and by appropriate denials and reiteration of averments contained in their petition, put in issue all of the material allegations of the defendant's pleading.

The evidence in this case discloses that during the months of June and July, 1921, there was consummated by the Insurance Company, the Trust Company, and the Wallace Company the more or less correlated plan for the making of real estate loans upon newly constructed dwelling houses in Council Bluffs, Iowa, repayment to be made upon an installment plan. The arrangement was generally evidenced by two written contracts; one contract between the Insurance Company and the Trust Company, and another contract between the Trust Company and the Wallace Company. These contracts generally define the relations and agreements of those companies. The plan as a whole contemplated that the Wallace Company, located at Council Bluffs, Iowa, and engaged in real estate and loan business, would solicit and receive applications for what are termed in the correspondence in evidence "dwelling house loans" and "loans upon new construc-tions"; that upon these applications the Wallace Company would negotiate the terms of the loans, see to the execution of the papers—applications, notes, mortgages, assignments, abstracts, attorneys' opinions, and other certificates—and transmit the completed file to the Trust Company, located at Omaha, Neb.; that the Trust Company, after examination and approval; would advance the money and retain temporarily the papers in the case, until a sufficient number of these loans had accumulated to aggregate a round sum of considerable proportions, when the Trust Company would make up a schedule of loans aggregating, for instance, $25,000, or $50,000, and transmit the schedule of loans to the Insurance Company, the mortgage and all assignments being recorded to show record title to the mortgage in the Insurance Company, and the Insurance Company, after approving and accepting the loans, would pay the Trust Company the adjusted amount.

The contract between the Insurance Company and the Trust Company is apparently drawn with care, with a view to restricting all contractual relation to the two parties signatory thereto, although the requirements of the contract impose obligations upon the Trust Company which, considering the whole plan, would imply co-operation by the Trust Company with other agencies. This contract includes nine divisions or paragraphs. I shall not set the contract out at large, but will describe the substance of these paragraphs, and quote such provisions as may be the subject of later comment in the opinion.

The first paragraph provides that the Trust Company shall act as correspondent for the Insurance Company for the purpose of submitting loans for sale, and shall act as agent in the collection and remittance of principal and interest.

The second paragraph describes the character of loans to be submitted, and that they shall be "on forms and terms approved by the company."

The third paragraph carries the provision that "the correspondent hereby guarantees to protect and hold harmless the company from all loss or damage by reason of any lien or incumbrance upon or defect in the title to the property securing such loan."

The fourth paragraph provides that "all loans must be closed, and all sums of money necessary for that purpose advanced, by the correspondent, and the necessary papers recorded before submitting them to the company."

The fifth paragraph provides that "upon

the approval and acceptance of the loan the company shall send a remittance to the correspondent, or deposit same to its credit in a New York bank, if so directed by the correspondent."

The sixth paragraph provides that, until the loans are paid in full, correspondent will attend to the collection and remittance of interest, and will see to the keeping up of insurance, payment of taxes, and notifying the company in respect thereto.

The seventh paragraph provides for retention by the correspondent as compensation for services of any excess in the net rate of interest.

The eighth paragraph provides that if any loans are not paid in full when due, or in case of default in conditions, the correspondent requests privilege of repurchasing upon basis of amount of principal and interest accrued, and other costs and expenses.

The ninth paragraph provides that the company reserves the right absolutely to determine whether the title is satisfactory.

The contract between the Trust Company and the Wallace Company includes eight paragraphs, and provides:

First. The Wallace Company to make collection of all interest on mortgages and remit to Trust Company in Omaha funds.

Second. The Wallace Company, "as representative of the party of the second part, will collect the principal amount of said mortgages or portions thereof * * * and will forward the same * * * in Omaha funds."

Third. The Wallace Company to see to it that all buildings are kept adequately insured, etc.

Fourth. That the Wallace Company will see to the payment of all taxes and notify the Trust Company of nonpayment.

Fifth. This paragraph carries the provision that the Wallace Company "guarantees to protect and hold harmless the party of the second part from all loss or damage by reason of any lien or incumbrance upon or defect in the title to the property securing such loan."

Sixth. That "all loans must be closed, and all sums of money necessary for that purpose advanced by the party of the first part, and the necessary papers recorded before submitting them to the party of the second part."

Seventh. That if any of the mortgages are not paid in full when due, or in case of default in conditions, the Wallace Company requests the privilege of repurchasing.

Eighth. That the Wallace Company, in case of payment in pursuance of certain options in the mortgage, will receive the payment and forward to the Trust Company in Omaha funds.

As stated, these two contracts generally evidence the arrangement. In the first, the Trust Company for certain purposes is denominated a correspondent, and for other purposes an agent; in the second, the Wallace Company for some purposes is denominated the representative of the Trust Company, and for other purposes it appears to be an adverse party. Numerous details, however, were later adjusted in the correspondence of the parties, and as between the Trust Company and the Wallace Company to some extent by parol agreement.

To illustrate: The contract between the two latter companies did not cover the subject of commissions or profits, and this matter seems to have rested upon verbal understanding. For a time, or at least in instances, the Trust Company took 2½ per cent. as its profit or compensation, leaving 1½ per cent. for the Wallace Company. The Wallace Company objected to this, and after conversation between Robert B. Wallace, president of the Wallace Company, and A. L. Reed, president of the Trust Company, it was agreed that the Trust Company's charge should be 2 per cent. thus leaving an equal amount for the Wallace Company, as that company, in negotiating the original terms with the borrower, bound the borrower to pay 4 per cent. In the instant case, however, the Trust Company appears to have charged the plaintiff John L. Peterson 2½ per cent.

The evidence indicates that the form of papers to be used was dictated by the Insurance Company. At the outset, and on July 14, 1921, the Trust Company writes the Wallace Company a letter, marked "Plaintiffs' Exhibit 2":

"We have a letter from the Metropolitan, executing our definite contract with them, and also sending us some of the papers used by their Iowa correspondents, and which I take it they are going to insist on your using. They specifically state, however, that before closing any loans the forms of papers to be used are to be submitted to the law division" (law division of the Insurance Company).

The form of application used, which was always signed by the borrower, or holder of title, was generally in terms an application to the Wallace Company for a loan of so many dollars to be secured by first mortgage upon the described property, with note pay-

able to or·"in favor of such person or corporation as is designated therein," thus leaving it at the option of the Wallace Company as to whom the papers should be made payable. The unvaried custom, however, was to make the papers payable to the Wallace Company, and for that company to indorse and assign to the Trust Company, and that company in turn to indorse and assign to the Insurance Company.

The application contained the following provision for the disbursement of the proceeds of the loan: "You are hereby authorized to pay off any prior mortgages or liens as above named, according to their terms, and any balance remaining above the loan herein applied for will be immediately paid for in cash by me." Thus it appears that the Wallace Company was authorized to disburse the proceeds of the loan to the extent of clearing the property of all liens, which in the case of a building loan, or "loan upon new construction," would include satisfaction of all mechanics' liens growing out of material or labor furnished. The actual practice of the parties was that upon execution and delivery of the papers to the Wallace Company, together with an assignment to the Trust Company was recorded, and the papers forwarded. to the Trust Company, where upon the approval of that company it opened an account on its books direct with the borrower, crediting the borrower with the face of the loan, and then executed an assignment of the mortgage to the Insurance Company. And, as before stated, when a sufficient number of loans had accumulated, to make up a schedule and forward to the Insurance Company. The account upon the books of the Trust Company in the instant case with John L. Peterson is as follows (Plaintiffs' Exhibit 49):

pany for $2,250; on May 21st an additional check of $1,125, and at that time Peterson was charged with the 2½ per cent. commission, aggregating $112.50, and later on June 16th the balance of the loan, $1,012.50, was remitted to the Wallace Company, a small allocation of interest being adjusted July 5th. Plaintiff testifies that at the time the loan was negotiated he was informed by the Wallace Company that the proceeds of the loan would only be paid as construction progressed, one-half at a certain stage, an additional 25 per cent. at another stage, and the balance on completion of the house. This appears to have been the exact apportionment adopted by the Trust Company in making these remittances, but the exact stage of construction at the time these remittances were made does not appear. The record without dispute shows that the Wallace Company, after recording and delivering the papers to the Trust Company, made its first disbursement on material and labor bills May 19th in the sum of $5, and continued frequent small disbursements until August 14th, when the total sums disbursed aggregated $1,941.43, and that the balance, subject to adjustment of commission, has never been paid by the Wallace Company to or for the plaintiffs.

One of the material questions for solution in the case is: Whom did the Wallace Company represent in receiving, disbursing, and making application of the proceeds of the loan? The positions and contentions of the respective counsel have not been altogether constant on this point since the case beganan. Plaintiffs' petition is a bit vague. They plead partial failure of consideration, and a demand upon the defendants through the Wallace Company for the balance, and refusal of said demand, which rather implies the contention

John L. Peterson, in Account with United States Trust Company, Omaha, Nebraska.

| 1923 | | Dr. | 1923 | | Cr. |
|---|---|---|---|---|---|
| May 11. | Check ·to Robt. B. Wallace Co.... | $2,250 00 | April 27. | By Loan #C1191.................... | $4,500 00 |
| May 21. | Check to Robt. B. Wallace Co..... | 1,125 00 | July 5. | Int. 4/27/23 to 6/16/23.............. | 23 59 |
| ·May 11. | Commission ........................ | 112 50 | | | |
| June 16. | Check to Robt. B. Wallace Co..... | 1,012 50 | | | $4,523 59 |
| July 5. | Check to Robt. B. Wallace Co..... | . 23 59 | | | |
| | | $4,523 59 | | | |

The evidence further shows that, after the receipt of the papers by the Trust Company and their approval, that company would advance the amount of the loan, or, at times when the improvement was in course of construction, a portion of the amount; as in the instant case, the $4,500 loan was credited to Peterson on April 27th, and on May 11th he was charged with a check to the Wallace Com-

that the Wallace Company represented one or both of the other defendants; the Insurance Company and the Trust Company. This thought is apparent from the record of the examination of witnesses. Since the filing of briefs, however, plaintiffs' counsel take the clean-cut position that they made their contract and loan with the Wallace Company, and that the Wallace Company sold the note

and mortgage to the Trust Company, and that that company in turn sold the note and mortgage to the Insurance Company. Plaintiffs then contend that the remittances by the Trust Company to the Wallace Company was mere payment to that company of the consideration of the purchase, and that plaintiffs not having been paid the loan in full by the Wallace Company may now defend against all defendants because of the claimed nonnegotiability of the note.

Counsel for plaintiffs and for the Insurance Company have exchanged in all seven briefs. Counsel for the Insurance Company, as I conceive it, first took the position now occupied by counsel for plaintiffs, that plaintiffs contracted with the Wallace Company, delivering their note to that company, which company sold that note to the Trust Company, which in turn sold the note to the Insurance Company, and that, the note being negotiable, the Insurance Company is protected. Later, it seems to me, counsel shifts to the position that plaintiffs made the loan from the Trust Company through the Wallace Company their agent, and therefore payment to the Wallace Company by the Trust Company is payment to the plaintiffs. In the third brief filed by the Insurance Company its counsel say:

"The Metropolitan Life Insurance Company contends: (a) That the note is negotiable and that it acquired title thereto in the ordinary course of business without notice of the alleged failure of consideration. (b) If the note is nonnegotiable, then the Metropolitan contends that it now develops that Wallace was agent of plaintiff, or intermediary representing plaintiff, for the purpose of obtaining the loan from the Metropolitan through the United States Trust Company, the loan to be obtained under cover of a sale of the note, and so payment of the money to Wallace is payment thereof to plaintiff, and there is no failure of consideration."

It may be conceded that there is some testimony in the record tending to support any one of a variety of theories, and to my mind the following questions suggest themselves:

(1) Was the loan negotiated by plaintiffs from the Insurance Company through its agent, the Trust Company, through its subagent the Wallace Company? If so, the question of negotiability of the note is immaterial, and plaintiffs are entitled to relief.

(2) Was the loan negotiated by plaintiffs from the Trust Company through its agent, the Wallace Company? And did the Trust Company sell the paper to the Insurance Company? If so, the question of negotiabil-

ity of the note is material, as plaintiffs, not having received the entire proceeds of the loan, would have equities against the Trust Company, which the Insurance Company would take subject to, if the note is nonnegotiable.

(3) Was the loan negotiated by plaintiffs from the Wallace Company? And did the Wallace Company sell the paper to the Trust Company, and the latter company sell to the Insurance Company? If so, the question of negotiability of the note is material, upon the same principle as that involved in the second question.

(4) Was the loan negotiated by plaintiffs from the Trust Company, Wallace Company acting as agent for plaintiffs throughout? If so, the question of negotiability of the note is immaterial, as the entire proceeds of the note were paid to the Wallace Company, plaintiffs' agent, and plaintiffs would not, therefore, be entitled to relief.

(5) Was the loan negotiated by plaintiffs from the Trust Company through the Wallace Company, plaintiffs' agent, which latter company, however, was under contract with the Trust Company to act as its agent in the performance of certain functions, viz. among others, to receive and disburse and see to the application of the proceeds of the loans during construction and until the title to the property was clear of liens? If so, the negotiability of the note is material, as plaintiffs would have equities against the Trust Company, which the Insurance Company, as a purchaser of the paper, would take subject to.

A careful examination of the record in this case has convinced me that the Insurance Company, by the terms of its contract with the Trust Company and by its conduct throughout, has limited its relations to the transaction to that of a purchaser of the paper. I think the proof entirely fails to support a contention that the Wallace Company was ever the agent of the Insurance Company, or that the Trust Company was the agent of the Insurance Company, except for the limited purposes specified in the contract between those two companies. I therefore reject the first question.

I think the second question must also be answered in the negative, for it is quite apparent that the Wallace Company acted as the agent of the plaintiffs in negotiating the loan, and in the performance of some functions.

I think the third question must also be answered in the negative. The record leaves no doubt in my mind tthat plaintiffs understood

all of the time that the Wallace Company was to procure the loan from the Trust Company, and that the ultimate source of funds was the Insurance Company. There is no evidence tending to show that the Wallace Company had any capital available for the making of such loans, and the undisputed evidence shows that plaintiffs were to pay the Wallace Company a commission to obtain the loan. Further, the Trust Company, on approving the loan, opened its account direct with Peterson the borrower.

I think the decision of this case lies in answering the fourth and fifth questions stated, treating them as alternative; that is, if the Wallace Company acted as the agent of the plaintiffs throughout, both receiving and disbursing the proceeds of the loan as the representative of the plaintiffs, then one need reason no further, for payment to the Wallace Company by the Trust Company would be equivalent to payment to the plaintiffs, and they would be entitled to no relief on this record. On the other hand, an affirmative answer to the fifth question stated would lead to an opposite conclusion.

In determining whether the Wallace Company, in receiving and applying the proceeds of the loan, was acting for the Trust Company or the plaintiffs, one must look beyond the specific terms of any one document contained in the record. The reciprocal relations, the responsibilities and reasonable motives, of all parties concerned, must be considered, as well as the consistent acts of the parties, not only throughout their relationship, but as applied to the instant transaction.

The whole record leaves no doubt that Wallace Company was without capital to make these loans or to finance them during the period pending their sale to the Insurance Company. All parties concerned seemed to recognize this. The contract between the Insurance Company and the Trust Company required that "all loans must be closed and all sums of money necessary for that purpose advanced by the correspondent and the necessary papers recorded before submitting them to the company." The correspondent under that contract was the Trust Company.

Again, that contract provided: "The correspondent hereby guarantees to protect and hold harmless the company from all loss or damage by reason of any lien or incumbrance upon or defect in the title to the property securing such loan." It is true that the contract between the Trust Company and the Wallace Company contains a similar clause; but it is evident that, as applied to the Wallace Company, that clause was always a dead letter, for

it is without dispute that the Trust Company made the advances to temporarily carry the loans.

The forms of the papers were prescribed for the Wallace Company, and one significant feature of the application, which the borrower was required to sign, is that the borrower relinquished all rights to the proceeds of the loan until the property was relieved of all liens, which in the case of these building loans would cover the period of time during construction and until proof had been furnished that all labor and material had been paid for. It is clear from the record that the Wallace Company was relied upon to see to the payment of labor and material bills and obtain receipts from the contractor as the proceeds of the loan were disbursed, and that the Trust Company was accustomed to accept the certificate of the Wallace Company as proof of the proper disbursement of the advancements made. On this point Mr. Goodbody, vice president of the Trust Company, testified:

"Q. What kind of a certificate did the Trust Company have? A. A certificate from Mr. Wallace that he had disbursed the proceeds.

"Q. Was it in reliance of that that the United States Trust Company furnished this certificate of disbursement to the Metropolitan Life, in each case? A. Yes, sir.

### Redirect Examination.

"Q. Then the United States Trust Company were relying on the statement of the R. B. Wallace Company with respect to what had been done in the disbursement of funds? A. Yes, sir."

Relying upon the certificate of the Wallace Company that that company had disbursed the funds, the Trust Company certified that fact to the Insurance Company, and the Insurance Company, in reliance upon the latter certificate, completed their purchase and payment for the loan.

On August 20, 1923, some question about disbursements having arisen, the Trust Company addressed a letter to the Wallace Company (Plaintiffs' Exhibit 34), in which it said:

"In reference to paying out on loans, will say that under no circumstances are we willing to pay out on any loan until we have a certificate and satisfactory proof from the owner that labor and material bills have been paid to a point where the amount which we are loaning is ample to complete the house, in the event of the failure or stoppage by the owner or contractor.

"As an example, if a man is building a

$6,000 house on a lot worth $1,000, making a total investment of $7,000, and borrowing $3,500, he must have his lot clear and show us receipts for at least $2,500, before we will make any advances. We make advances only as the work progresses, paying out up to 50 per cent. when the house is under roof and lathed, ready for plastering, 25 per cent. more when the plastering is finished and the wood-work delivered on the ground, and the balance when the house is finally completed."

The quoted language is highly significant as bearing on the understanding of the Trust Company relative to the control of disbursements. "Under no circumstances are we willing to pay out on any loan until we have a certificate and satisfactory proof from the owner that labor and material bills have been paid to a point where the amount which we are loaning is ample to complete the house, in the event of the failure or stoppage by the owner or contractor." This clearly implies that the Trust Company was willing to pay out if it had a certificate or satisfactory proof from the owner that labor and material bills had been paid to the point indicated. And it is clear that the Trust Company never had submitted to it any receipted material or labor bills, but relied upon the Wallace Company in that connection. And I think it clear that when, in the second quoted paragraph, the Trust Company uses the language, "he must have his lot clear and show us receipts for at least $2,500," by the expression "us" the Trust Company meant the Trust Company and the Wallace Company collectively co-operating.

To put this quoted declaration of the Trust Company to the test, suppose proof should be furnished that labor and material bills had been paid to a point where the amount of the proceeds of the loan would be ample to complete the house, and suppose, further, that the Trust Company paid out, as the language of the letter implies they will do on that proof, then suppose, after it has paid out on the loan, the owner fails and stops. How will the Trust Company "complete the house," unless it controls the proceeds of the loan in the hands of the Wallace Company? What means of protection in that respect would the Trust Company have if the money advanced to the Wallace Company is considered an absolute payment to borrower, and to pass under the dominion and control of the borrower? It seems to me that in such case the Trust Company would be relinquishing the very security it would be attempting to maintain, and incur the very peril it is attempting to guard against. It is manifest that the only way the Trust Company would protect itself against peril and loss, in view of its covenant to advance money, and its guaranty to protect against liens made to the Insurance Company, would be to keep control of the proceeds of the loan until they were properly applied, and in no event pending such application to permit them to pass into the control of the borrower.

Every dictate of rational business judgment would require such a course, and I am satisfied, from a view of the plan of business as a whole, the interests, responsibilities, and the relations of the parties, that such was the intent. In correspondence between the Trust Company and the Insurance Company, the Trust Company repeatedly referred to the Wallace Company as its agent. To illustrate: On June 14, 1921, at the outset, the Trust Company writes the Insurance Company: "At an informal meeting of our directors, held to-day, it was decided that we would accept the agency for dwelling house loans for the city of Council Bluffs, Iowa, said loans to be made through Robert B. Wallace Company." Replying to this letter, the Insurance Company on July 13, 1921, cover this and other suggestions by the Trust Company, and, after stating that they have no contracts prepared which can be used in case of subagent, continue: "As a matter of fact such arrangements are entirely between your company and the party you care to appoint to handle the business." It is thus seen that the Insurance Company is quick to negative the idea of agency between it and the Trust Company, but the correspondence throws light upon the idea of the Trust Company's relation to the Wallace Company. Again, on July 15, 1921, the Trust Company writes the Insurance Company: "Our agent advises loans will be placed elsewhere, if impossible to promptly advise acceptance." And again, February 8, 1922: "Our agent there—the Robert B. Wallace Company—has in sight from $100,000 to $200,000 of high-grade dwelling house loans," etc.

It might be suggested that the contract between the Trust Company and the Wallace Company limits the Wallace Company's agency to the particular matters specified therein; but the quoted correspondence does not refer to those matters—i. e., payment of taxes, interest collections at maturity, etc. The matter here under discussion was the activities of negotiating and selling loans. From the whole record I am satisfied that the Trust Company relied entirely upon the Wallace

Company to see to the application of the proceeds of the moneys advanced by it, and that under the entire scheme the Wallace Company was the agent of the Trust Company for that purpose. To conclude otherwise would be to assume that the Trust Company unwittingly assumed covenants and obligations of great magnitude running to the Insurance Company, and as wittingly omitted all reasonable precaution for its own protection. I therefore answer the fifth question in the affirmative.

In view of the determination of the question just under discussion, it becomes material to determine whether the note in question is negotiable. The note proper is the joint note of John L. Peterson and Helen Louise Peterson, is for $4,500, dated April 27, 1923, bearing 6 per cent. interest, due in semiannual installments of $140, up to and including September 1, 1938, on which date all remaining unpaid principal matures. The note carries various promises and privileges not affecting negotiability, and in addition thereto the following quoted provisions:

"This note, with interest, is secured by a first mortgage of even date herewith, executed and delivered by the maker hereof to said Robert B. Wallace Company, conveying certain real estate described therein, in Pottawattamie county, state of Iowa, the terms whereof are made a part hereof. * * * This contract is to be construed in all respects and enforced according to the laws of the state of Iowa."

The mortgage referred to, and which by the note is made a part thereof, contains the following provisions (Plaintiffs' Exhibit No. 55):

"And said parties of the first part further covenant and agree to keep the buildings on said premises constantly insured, for the benefit of the party of the second part, against loss by fire and tornado, in such manner and in such companies and for such amounts as may be satisfactory to the party of the second part, until the debt hereby secured is fully paid, and to keep such policies constantly assigned or pledged to the party of the second part, and to deliver renewals thereof to the said Robert B. Wallace Company at its office in Council Bluffs, Iowa, one week in advance of the expiration of the same, stamped 'Paid' by the agent or company issuing same. In the event the parties of the first part, their heirs, executors, administrators, successors, or assigns, shall for any reason fail to keep the said premises so insured, or fail to deliver the policies of insurance to the said party of the second part, or fail to pay the premiums

thereon, the party of the second part, if it so elects, may have such insurance written and pay the premiums thereon, and any premiums so paid shall be secured by this mortgage and repaid by the parties of the first part, their heirs, executors, administrators, successors, or assigns, within ten days after payment by the party of the second part. In default thereof, the whole principal sum and interest, and insurance premium, with interest on such sum paid for such insurance from the date of payment, may be and shall become due, at the election of the said party of the second part, its successors or assigns, anything herein to the contrary notwithstanding. * * *

"And it is further mutually covenanted and agreed that, in the event of the passage, after the date of this mortgage, of any law of the state of Iowa deducting from the value of land for the purpose of taxation any lien thereon, or changing in any way the laws now in force, or the taxation of mortgages or debts secured by mortgage for state or local purposes, or the manner of the collection of any such taxes, so as to affect this mortgage, the whole of the principal sum secured by this mortgage, together with the interest due thereon, shall, at the option of the said party of the second part, without notice to any party, become immediately due and payable. * * *

"And it is further mutually covenanted and agreed by said parties that, in default of the payment by said parties of the first part of all or any taxes, charges, and assessments which may be imposed by law upon the said mortgaged premises, or any part thereof, it shall and may be lawful for the said party of the second part, its successors, legal representatives, and assigns, to pay the amount of any such tax, charge, or assessment, with any expenses attending the same; and any amounts so paid the parties of the first part shall repay to the said party of the second part, its successors, legal representatives, or assigns, on demand, with interest thereon, and the same shall be a lien on the said premises and be secured by the said note and by these presents; and the whole amount hereby secured, if not then due, shall thereupon, if the said party of the second part so elects, become due and payable forthwith. And the said parties of the first part do further covenant and agree that they will execute or procure any further necessary assurance of the title to said premises and will forever warrant said title."

It is contended by plaintiffs' counsel that the note in question is nonnegotiable, for that it is uncertain as to the amount promised to be paid by reason of:

(a) The provision whereby the makers

agree to keep buildings insured, and in the event of failure the holder to have the privilege of writing such insurance and paying the premiums, and demand repayment from the makers within 10 days, and in default to declare the whole debt due, including insurance premiums with interest.

(b) The provision that, in default of payment of taxes, charges, and assessments, it shall be lawful for the holder to pay the same with expenses attending, the makers to repay same on demand, and the note to stand as security therefor.

It is contended by plaintiffs' counsel that the note in question is nonnegotiable, for that the time of payment is uncertain by reason of the following provisions contained in said note:

(a) The covenant that, in the event of passage of any law deducting from the value of land for taxation purposes, or change of laws affecting the taxation of mortgages or the collection of taxes, so as to affect the mortgage, the whole amount may be declared due.

(b) The provision that, in default of payment of taxes, charges, or assessments, it shall be lawful for the holder to pay the same, with expenses, and demand repayment, and in default declare the whole amount due.

What is generally known as the Negotiable Instrument Law was at all times material in force in the state of Iowa. Acts 29th Gen. Assem. c. 130.

[1] The note in question, with its accompanying mortgage, was executed and delivered to the original, if nominal, payee in the state of Iowa, is payable in that state, and by its terms it is provided that the contract is to be construed in all respects and enforced according to the laws of the state of Iowa. There is some discussion on the briefs, as was there also in oral argument, which questions whether and how far this court is bound by the decisions of the Supreme Court of Iowa in solving the question of the negotiability of the note here involved. I hardly think any matter is here presented with respect to which the action of this court is controlled by the decisions of the Supreme Court of Iowa, if any should be found in conflict with the settled principles of commercial law as recognized in the federal jurisdiction. It is difficult for me to see that there really is any question of statutory construction here presented. I rather incline to the view that the matter of interpretation is one of contract, rather than law. But it may not be altogether unfitting to examine this question before proceeding further.

The basis for the binding effect of state decisions upon federal courts is generally referred to the thirty-fourth section of the Judiciary Act of 1789 (Comp. St. § 1538). In a case involving the rights of a bona fide holder of commercial paper, Mr. Justice Story, in the leading case of Swift v. Tyson, 41 U. S. (16 Pet.) 1, 17 (10 L. Ed. 865), said:

"It is, however, contended that the thirty-fourth section of the Judiciary Act of 1789, c. 20, furnishes a rule obligatory upon this court to follow the decisions of the state tribunals in all cases to which they apply. That section provides 'that the laws of the several states, except where the Constitution, treaties or statutes of the United States shall otherwise require or provide, shall be regarded as rules of decision, in trials at common law, in the courts of the United States, in cases where they apply.' In order to maintain the argument, it is essential, therefore, to hold that the word 'laws,' in this section, includes within the scope of its meaning the decisions of the local tribunals. In the ordinary use of language, it will hardly be contended that the decisions of courts constitute laws. They are, at most, only evidence of what the laws are, and are not, of themselves, laws. They are often re-examined, reversed, and qualified by the courts themselves, whenever they are found to be either defective, or ill-founded, or otherwise incorrect. The laws of a state are more usually understood to mean the rules and enactments promulgated by the legislative authority thereof, or long-established local customs having the force of laws. In all the various cases which have hitherto come before us for decision, this court have uniformly supposed that the true interpretation of the thirty-fourth section limited its application to state laws, strictly local; that is to say, to the positive statutes of the state, and the construction thereof adopted by the local tribunals, and to rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character. It never has been supposed by us that the section did apply, or was designed to apply, to questions of a more general nature, not at all dependent upon local statutes or local usages of a fixed and permanent operation, as, for example, to the construction of ordinary contracts or other written instruments, and especially to questions of general commercial law, where the state tribunals are called upon to perform the like functions as ourselves; that is, to ascertain, upon general reasoning and legal analogies, what is the true exposition of the contract or instrument, or what is the just rule furnished by the prin-

ciples of commercial law to govern the case. And we have not now the slightest difficulty in holding that this section, upon its true intendment and construction, is strictly limited to local statutes and local usages of the character before stated, and does not extend to contracts and other instruments of a commercial nature, the true interpretation and effect whereof are to be sought, not in the decisions of the local tribunals, but in the general principles and doctrines of commercial jurisprudence."

In Watson v. Tarpley, 59 U. S. (18 How.) at page 521, 15 L. Ed. 509, Mr. Justice Daniel, after quoting with approval the foregoing language in Swift v. Tyson, said:

"The general commercial law being circumscribed within no local limits, nor committed for its administration to any peculiar jurisdiction, and the Constitution and laws of the United States having conferred upon the citizens of the several states, and upon aliens, the power or privilege of litigating and enforcing their rights acquired under and defined by that general commercial law, before the judicial tribunals of the United States, it must follow by regular consequence that any state law or regulation, the effect of which would be to impair the rights thus secured, or to devest the federal courts of cognizance thereof, in their fullest acceptation under the commercial law, must be nugatory and unavailing."

In Railroad Co. v. National Bank, 102 U. S. at page 31, 26 L. Ed. 61, Mr. Justice Harlan, speaking for the court, after approving the rule in Swift v. Tyson, said:

"The decisions of the New York court, which we are asked to follow in determining the rights of parties under a contract there made, are not in exposition of any legislative enactment of that state. They express the opinion of that court, not as to the rights of parties under any law local to that state, but as to their rights under the general commercial law existing throughout the Union, except where it may have been modified or changed by some local statute. It is a law not peculiar to one state, or dependent upon local authority, but one arising out of the usages of the commercial world."

In Presidio County v. Noel-Young Bond Co., 212 U. S. 58, 73, 29 S. Ct. 237, 242 (53 L. Ed. 402), Mr. Justice Harlan said:

"Since the decision in Swift v. Tyson, 16 Pet. 1, 19 [10 L. Ed. 865], it has been the accepted doctrine of this court that in respect of the doctrines of commercial law and general jurisprudence the courts of the United States will exercise their own independent judgment, and in respect to such doctrines will not be controlled by decisions based upon local statutes or local usage, although, if the question is balanced with doubt, the courts of the United States, for the sake of harmony, 'will lean to an agreement of views with the state courts' "—citing Burgess v. Seligman, 107 U. S. 20, 2 S. Ct. 10, 27 L. Ed. 359; Pana v. Bowler, 107 U. S. 529, 2 S. Ct. 704, 27 L. Ed. 424; Oates v. Nat. Bank, 100 U. S. 239, 25 L. Ed. 580.

A very long line of additional decisions could also be cited, affirming the principle announced in Swift v. Tyson. From that line of authorities I deduce the following propositions:

[2] 1. Upon questions of a construction of a state statute local in its nature, the federal courts deem themselves bound by the decisions of the highest court of the state.

[3] 2. That the federal courts in their recognition and application of the general principles of commercial law are not bound by the decisions of state courts.

[4] 3. That where a state Legislature by statute has modified the principles of general commercial law, the federal courts will recognize such modification, and to the extent that such legislation modifies the law merchant the federal courts will follow the highest court of the state in its interpretation of such modified legislation. Smith v. Nelson Land & Cattle Co., 212 F. 56 (C. C. A. 8th Circuit).

[5] 4. That the federal courts are not to be deemed bound by the decisions of the highest courts of a state upon questions of interpretation of contracts, with the exception where by their settled local interpretation, rules of property have been established. Jackson ex dem. St. John v. Chew, 12 Wheat. 167, 6 L. Ed. 583.

[6] 5. That federal courts will not be deemed bound by the decisions of state courts in their construction of statutes which are merely declaratory of the common law. Upon this last principle the Supreme Court of the United States in Clark v. Bever, 139 U. S. at page 116, 11 S. Ct. 475, 35 L. Ed. 88, said:

"The recognition in the Iowa statute of the right of creditors of corporations to look to unpaid instalments of stock subscriptions to obtain satisfaction of their demands *did not confer a new right* (italics are mine), but is a recognition of a right existing before the statute," etc. " * * * The decisions of the state court are not, therefore, to be regarded as resting upon the local statute, but only as expressing the views of that tribunal in respect to the same principles of general law announced by this court, after the fullest con-

sideration, in the numerous cases to which we have adverted."

See, also, Capital City State Bank v. Swift (D. C.) 290 F. 505.

[7] Now, while the Negotiable Instrument Law was at all times material upon the statute books of Iowa, that legislative enactment, as I conceive it, so far as it bears upon the negotiability of the note in question, is merely a declaration of the well-settled principles of commercial law. The unconditional quality of the promise, the certainty of the amount, and the certainty of the time of maturity were all elements well settled before they were restated by the Iowa Legislature. I therefore conclude that, in determining the negotiability of the note, this court must deem itself bound only by the decisions of the superior federal courts. However, so far as they bear upon the instant case, I find no conflict between the decisions of the Supreme Court of Iowa and those of the United States Supreme Court, and the Circuit Court of Appeals of this circuit. Indeed, wherever I have come in contact with matters of common consideration there seems to have been great coincidence of judgment. And in this connection it is not inopportune to ascertain what the Iowa Supreme Court has said upon cases of at least some degree of similarity.

One of the earlier cases decided by the Iowa Supreme Court touching upon notes carrying provisions relative to security is that of Smith v. Marland, 59 Iowa, 645, 13 N. W. 852. The note carried provision that the "payee or his indorsee has full power to declare this note due and take full possession of said property at any time they may deem themselves insecure, even before the maturity of this note, and sell the same when this note is payable, on five days' notice in writing." The note was held nonnegotiable, inasmuch as the holder on the contingency named might reduce the amount recoverable. This decision is important here merely as indicating the early attitude of the Iowa court to the effect that provisions which permit the holder to deal with security in such a way as to make it possible that the note will be diminished before maturity render the amount of the note uncertain. The Marland Case, supra, was cited and approved in Lincoln National Bank v. Perry, 66 F. 887, 893, 894, a very similar case, by the Circuit Court of Appeals of this circuit. In that connection, we are now considering whether provisions carried in a note which permit the holder to act with respect to the security before the maturity of the note, in such manner as to increase the amount recov-

erable thereon, do not likewise render the amount of the note uncertain and therefore nonnegotiable.

Another case is that of Culbertson v. Nelson, 93 Iowa, 187, 61 N. W. 854, 27 L. R. A. 222, 57 Am. St. Rep. 266. This case is interesting in assuring us that the mere matter of the inconsequential amount involved in the uncertainty is not controlling. In that case a draft drawn with exchange was held to render the draft uncertain, and therefore nonnegotiable, for the reason that the exact rate of exchange could not be known in advance. Judge Shiras, some five years prior to the rendition of the Culbertson decision by the Supreme Court of Iowa, while sitting in this district, in the case of Windsor Savings Bank v. McMahon (C. C.) 38 F. 283, 3 L. R. A. 192, announced the same doctrine, holding that the words, "with exchange on New York," rendered a promissory note nonnegotiable.

In the case of Iowa National Bank v. Carter, 144 Iowa, 715, 123 N. W. 237, it was held that a note given in connection with a chattel mortgage securing the same, which mortgage provided that the whole debt should become due in case of the sale or removal of the property from the county without the consent of the mortgagee, or in case the mortgagee deemed himself insecure, rendered the note uncertain both as to time and amount, and therefore nonnegotiable.

The case of State Bank of Halstad v. Bilstad, 162 Iowa, 433, 136 N. W. 204, 144 N. W. 363, 49 L. R. A. (N. S.) 132, involved only the question of uncertainty as to time of payment. It was there held that the provision in a note: "It is agreed that if the crop on sections 25 and 26, township 145—48, is below 8 bushels per acre (for 1905 as to one and 1907 as to the other), this note shall be extended one year," did not render the note nonnegotiable, as the note was due at a fixed or determinable future date. There is a confusing quotation found on page 439 in the opinion in that case (136 N. W. 205), where reference is made to the Carter Case, but examination of the same opinion in 136 N. W. 204, and a supplemental opinion in 144 N. W. 363, clears up the confusion and makes it clear that the matter quoted on page 439 (136 N. W. 205) should be considered as eliminated from the opinion. Thus the opinion in the Carter Case as originally written stands, and the note in that case deemed uncertain both as to time and amount.

A most interesting Iowa case is that of Des Moines Savings Bank v. Arthur, 163 Iowa, 205, 143 N. W. 556, Ann. Cas. 1916C,

.498. In that case the note was secured by real estate mortgage which carried the following provision:

"Said first party shall pay all taxes and assessments upon said property to whomsoever laid, or assessed, and including personal taxes, and should any reduction be made in the assessment of taxes on said land by reason of this mortgage, and payment thereof required of the mortgagee or assigns, then said mortgagor shall pay the taxes on this mortgage and the debt hereby secured before delinquent; and said first party shall not suffer waste, shall keep all buildings thereon insured to the satisfaction of said second party in a sum not less than two hundred dollars, delivering all policies and renewal receipts to said second party. * * * A failure to comply with any one of the agreements hereof (including warranty of title) causes the whole debt to at once become due and collectible, if said second party or assigns so elect, and no demand for fulfillment of broken conditions nor notice of election to consider the debt due, shall be necessary previous to commencement of suit to collect the debt hereby secured, or any part thereof, or to foreclose this mortgage. * * * All money paid by said second party or assigns for insurance or taxes shall bear interest at the rate of 8 per cent. per annum, payable semiannually, and be a lien on said land under this mortgage."

Speaking for the court, Mr. Justice Ladd said:

"It is settled, in this state at least, that the note and mortgage, having been executed at the same time and as a part of the same transaction, are to be construed together. Iowa National Bank v. Carter, 144 Iowa, 715 [123 N. W. 237]; Swearingen v. Lahner, 93 Iowa, 147 [61 N. W. 431, 26 L. R. A. 765, 57 Am. St. Rep. 261]. And such appears to be the general rule. Brooke v. Struthers, 110 Mich. 562 (68 N. W. 272, 35 L. R. A. 536, and note); 1 Jones on Mtgs. § 71. This is but the application of the familiar doctrine concerning the construction of agreements contemporaneously executed.

"But how far under this rule are the collateral agreements contained in the mortgage to be imparted into the note? On the margin of the note were these words: 'This note is secured by first mortgage on one hundred and one acres in Madison township, Madison county, Iowa.' This may have advised the transferee of the security, but did not purport to load the note with any of its particular provisions. The note was complete in itself and, as usual, was given as evidence of the debt and to fix the time and terms of payment. The purpose of the mortgage was to afford security for the payment of the note, and all the conditions in the part quoted, except one, relate to the protection and preservation of the security. These have no bearing on the engagements contained in the note. While the note and mortgage are to be construed together whenever the nature of the transaction becomes material, this does not mean that the provisions of the mortgage are thereby incorporated into and become part of the note. As said in Thorp v. Mindeman, 123 Wis. 149 (101 N. W. 417, 68 L. R. A. 146, 107 Am. St. Rep. 1003):

. "Construing together simply means that, if there be any provisions in one instrument limiting, explaining, or otherwise affecting the provisions of another, they will be given effect as between the parties themselves and all persons charged with notice, so that the intent of the parties may be carried out, and that the whole agreement actually made may be effectuated. * * * The promise to pay is one distinct agreement, and, if couched in proper terms, is negotiable. The pledge of real estate to secure that promise is another distinct agreement, which ordinarily is not intended to affect in the least the promise to pay, but only to give a remedy for failure to carry out the promise to pay. The holder of the note may discard the mortgage entirely and sue and recover on his note, and the fact that a mortgage had been given with the note, containing all manner of agreements relating simply to the preservation of the security, would cut no figure. A pleading alleging such facts would be stricken out as frivolous or irrelevant.

"In Garnett v. Myers, 65 Neb. 280 (91 N. W. 400, 94 N. W. 803), Sedgwick, J., in speaking for the court concisely states the rule: 'If the terms and conditions of the mortgage are limited to the proper province of the mortgage—that is, to provide security for the indebtedness—its provisions relating solely to the security will not affect the negotiability of the note. If the holder of the note is compelled to pay the taxes or insurance on the mortgaged property to protect the security, and is afterwards allowed to recover the amount so paid in addition to the principal indebtedness, this does not affect the amount of the indebtedness itself. The mortgagee has no interest in the mortgaged property except a collateral and contingent one. The liability for these expenses is upon the mortgagor. If he shirks this responsibility, and compels the mortgagee to assume it, equity allows the mortgagee to add the payment so made to his mortgage. This right has long

been established as an essential element of the mortgage itself. It cannot be held to destroy the negotiability of the note, unless the fact that the execution of the note is accompanied by the execution of a mortgage securing it is to have that effect. This principle applies to all agreements of the mortgagor to preserve the collateral security. It does not affect the rule that the two instruments, when executed at the same time, must be construed together. The provisions contained in the mortgage to protect the securities, which would be implied and enforced upon settled principles of equity, whether expressed in the mortgage or not, cannot be held to render the note nonnegotiable.' See, also, Kendall v. Selby, 66 Neb. 60 (92 N. W. 178, 103 Am. St. Rep. 697); Frost v. Fisher, 13 Colo. App. 322 (58 P. 872); Hunter v. Clarke, 184 Ill. 158 (56 N. E. 297, 75 Am. St. Rep. 160).

"It will be observed that the mortgage contains no promise on the part of the mortgagor to repay mortgagee taxes or premiums for insurance which may have been advanced by him. These are to be a lien on the land and, of course, may be recovered upon foreclosure of the mortgage. The maker of the note does not thereby become liable for payment thereof save as he may be required to pay to redeem his land from the proceedings in foreclosure of the mortgage. The obligation of his note was in no manner enhanced or otherwise affected either as to time or amount of payment. As observed in Hunter v. Clarke, supra, 'the provisions of the mortgage for the allowance of costs, taxes, assessments, insurance, and attorney's fees apply only in case of foreclosure and do not add to the amount of the note.'

"A separate action could have been maintained on the note (section 3428, Code), or on the mortgage, unless this is prevented by some stipulation in one or the other, as that execution shall not issue against property other than that mortgaged (Kennion v. Kelsey, 10 Iowa, 443); but actions on each cannot be prosecuted in the same county at the same time, for, if undertaken, the plaintiff will be required to elect which he will maintain (section 4288, Code). And as the maker of the note did not agree to pay the items of taxes, insurance, and the like in his note, the amount payable thereon has not been rendered uncertain by the terms of the mortgage.

"As intimated, one clause in the mortgage was not inserted to protect the security, but to place a burden on the mortgagor: 'Should any reduction be made in the assessment of taxes on said land by reason of this mortgage and payment thereof required of the mortga-

gee or assigns, then said mortgagor shall pay the taxes on this mortgage and the debt thereby secured before delinquent.' This merely exacted payment by the mortgagor of taxes assessed on the credits owing the mortgagee which, but for this, the latter must have paid. But as pointed out, if not paid by the mortgagor and discharged by the mortgagee, there is no condition entitling him to recover the same as a part of the indebtedness evidenced by the note or otherwise save by enforcing the lien specifically stipulated against the land mortgaged.

"In this respect, the mortgage differs from that considered in Garnett v. Meyers, 65 Neb. 287 (91 N. W. 400, 94 N. W. 803); Consterdine v. Moore, 65 Neb. 291 (91 N. W. 399, 96 N. W. 1021, 101 Am. St. Rep. 620), where it was provided that 'the said party of the second part, or the legal holder or holders of said note, * * * may elect to pay such taxes, assessments, * * * and the amount so paid shall be secured by the mortgage and may be collected in the same manner as the principal debt hereby secured, with interest at the rate of ten per cent. per annum.' In holding that this provision rendered the note nonnegotiable, the court seems to have held that, under this clause, taxes so paid by the mortgagee might be recovered in an action on the note, and therefore the amount payable was uncertain. No one can anticipate precisely what the tax levies of the future will be, and for this reason such a stipulation when contained in a note renders it nonnegotiable. Farquar v. Fidelity Ins., etc., Co., Fed. Cas. No. 4,676; Howell v. Todd, Fed. Cas. No. 6,783; Walker v. Thompson, 108 Mich. 686 (66 N. W. 584); Carmody v. Crane, 110 Mich. 508 (68 N. W. 268). See, also, Brooke v. Struthers, 110 Mich. 562 (68 N. W. 272, 35 L. R. A. 536).

"As the provisions of the mortgage in the case at bar did not render the amount payable on the note uncertain, the note cannot be denounced as nonnegotiable on this ground."

It will be observed that in the Arthur Case, the note on the margin carried the notice: "This note is secured by first mortgage on one hundred and one acres in Madison township, Madison county, Iowa." It will be further observed that the court said: "This may have advised the transferee of the security, but did not purport to load the note with any of its particular provisions." It was clearly held that the notation did not draw the provisions of the mortgage into the note itself.

In the instant case, the note by its very terms draws every provision of the mortgage within the four corners of the note. The

court in the Arthur Case further said: "It will be observed that the mortgage contains no promise on the part of the mortgagor to repay mortgagee taxes or premiums for insurance which may have been advanced by him." On the contrary, in the instant case the mortgage, which is made a part of the note, carries an express promise to repay, and the makers do become liable for repayment.

It does not appear from the opinion in the Arthur Case in whose name the title to the land stood at the time of the execution of the note and mortgage, nor was it material in that case in view of the conclusions of the court. But in the instant case it appears without controversy that the title to the real estate was in John L. Peterson, and the plaintiff Helen Louise Peterson had no interest therein other than her inchoate right of dower, no homestead right having yet attached. Without the promise contained in the note, John L. Peterson might be liable personally for the payment of the tax or assessment, provided he continued to own the real estate when such tax or assessment was levied. But John L. Peterson would not be liable to the holder of the note for such tax or assessment, nor would Helen Louise Peterson be liable at all. Therefore liability to the holder of the note for repayment of any tax or assessment which might be thereafter levied, would rest entirely upon the promise contained in the note, and that promise in turn would rest entirely upon the original consideration for the note.

Now, with the provisions in question read into the note itself, it seems to me clear that the amount recoverable on that instrument at maturity is altogether uncertain. Suppose the city authorities should order down pavement abutting the property and assess the cost, for instance, $600, against the frontage. Then suppose, on default of payment, the holder of the note should pay off that assessment and then sue John L. Peterson and Helen Louise Peterson on the note, setting up the note and the fact of levy of the assessment and the payment thereof. What would John L. Peterson or Helen Louise Peterson have to pay to get their note back?

[8] I therefore conclude that the note in question was uncertain in amount, as contemplated by the law merchant, and by the Negotiable Instrument Law of Iowa, which I conceive in that respect merely restates the law merchant.

[9] I therefore conclude: First. That the Insurance Company was not a purchaser of a negotiable note in due course. Second. That plaintiffs are not estopped by reason of the

opinion upon the title rendered by the law firm of Kimball, Peterson, Smith & Peterson. In the latter connection, the opinion rendered by that firm was rendered on May 18, 1923, and related entirely to the record title as shown by the abstract. Third. That the Wallace Company was not the agent of the plaintiffs to see to the disbursement and application of the proceeds of the loan.

In view of the conclusions reached, the plaintiffs are entitled to the relief prayed; that is, upon payment into court for the benefit of the holder of the note of the sum of $1,-942.33 with simple interest thereon at the rate of 6 per cent. from the 1st day of July, 1923, within 20 days from the entry of the decree herein, the note and mortgage in controversy to be canceled and the record thereof satisfied; the defendant Metropolitan Life Insurance Company's cross-bill to be dismissed; the costs in the cause to be taxed to the defendant Metropolitan Life Insurance Company.

Let a decree be prepared and entered in conformity with this opinion, saving exception to all parties.